736 S.W.2d 685 (1987)
Michael Albert GOLD, Appellant,
v.
The STATE of Texas, Appellee.
No. 767-85.
Court of Criminal Appeals of Texas, En Banc.
September 23, 1987.
Joseph A. Calamia, El Paso, for appellant.
Steve W. Simmons, Dist. Atty. and Robert Dinsmoor, Asst. Dist. Atty., El Paso, Robert Huttash, State's Atty., Austin, for the State.
Before the court en banc.
OPINION ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
CLINTON, Judge.
Appellant was indicted for the offense of murder. The indictment alleged he intentionally or knowingly caused the death of Ronald Kopp, a longtime friend whom he had discovered in a motel room with his wife. There was no dispute at trial that the issue of sudden passion arising from an adequate cause had been raised by the evidence, and thus the jury was charged in accordance with our decision in Cobarrubio v. State, 675 S.W.2d 749 (Tex.Cr.App.1983), requiring a finding of the absence of sudden passion beyond a reasonable doubt before *686 a verdict of murder could be reached. Bradley v. State, 688 S.W.2d 847 (Tex.Cr. App.1985). Having apparently made such a finding, the jury found appellant guilty of murder, and assessed his punishment at thirty years confinement in the Texas Department of Corrections.
On appeal to the El Paso Court of Appeals appellant contended, inter alia, that the evidence was insufficient to support the jury finding that he had acted in the absence of sudden passion. In rejecting this contention, the court of appeals refused to construe our holdings in Cobarrubio, supra, and Braudrick v. State, 572 S.W.2d 709 (Tex.Cr.App.1978) as necessarily "demanding active disproof of sudden passion by the State to the same degree as any affirmative element of the offense of murder." Gold v. State, 691 S.W.2d 760, at 763 (Tex.App.El Paso 1985). The court of appeals reasoned that to so construe those cases would negate the jury's prerogative to assess the credibility of witnesses. Viewing the evidence in the light most favorable to the verdict, the court of appeals effectively gleaned circumstances from the record from which it held a rational jury could choose to reject appellant's testimony raising sudden passion, and thereby find its absence beyond a reasonable doubt. In this way the court of appeals believed it could give full play to the jury's role as arbiter of witness credibility while preserving the requirement that the State shoulder the burden of proving absence of sudden passion. The judgment of conviction was affirmed.
Appellant petitions this Court to reverse the court of appeals' judgment that absence of sudden passion was proven beyond a reasonable doubt. We granted appellant's petition in order to clarify the proper standard for appellate review of this sufficiency question, particularly in view of what the court of appeals aptly called "[t]he peculiar relationship between murder and voluntary manslaughter[.]"[1]Id. See former Tex.Cr.App. Rule 302(c)(2), now Tex.R.App.Pro., Rule 200(c)(2). Ultimately we affirm the judgment of the court of appeals.

I.
There is no question from the record that appellant shot and killed Ron Kopp with a .38 caliber two-shot derringer. Kopp was shot twice as he sat in a chair in the motel room, once through the shoulder area, a nonfatal wound, and again in the top of the head, apparently as he slumped over. The second shot was the cause of death. The *687 issue at trial was not the identity of the killer, but his state of mind at the time of the killing.
The State's evidence established the following. At approximately 9:45 p.m. on the night of June 6, 1983, appellant appeared at the front desk of the Airport Holiday Inn in El Paso, asking if the motel had a guest by the name of "Kopp." At first appellant was directed to room 305. When the motel clerk volunteered to alert the guest that he was coming, appellant declined, asserting that he "wanted to surprise him." Ten to fifteen minutes later, appellant returned to the front desk and inquired if the motel might have another "Kopp" registered. The clerk discovered that there was in fact another, in room 153.
Sometime around 9:50 p.m. Robert Silvester answered a "harsh" knock at his door in room 151. There he found appellant, who apologized for having the wrong room and left. Ten minutes later Silvester heard the same harsh knock next door. He then heard "some shouting, and a woman kind of screaming," a door slam, and a male voice ask, "What are you doing here?" After another eight to ten minutes he heard a shot, and, ten to fifteen seconds after that, a second shot. Peering through the curtain of his window, Silvester watched appellant and a woman depart from the room next door and drive away in a blue "sporty-looking" car.[2]
Appellant and his wife, Nellie Lopez Gold, appeared at the front door of Nellie's aunt and uncle, Esther and Robert Taylor, sometime between 10:45 and 11:00 p.m. that night. Appellant told them he had "just killed a man, that he shot Nellie's lover." Esther testified that, asked whom he had shot, appellant told her, "Ron Kopp." Appellant called his attorney, and while waiting for a return call, related the details to the Taylors. He said he had been looking for Nellie all day. Thinking she might have gone to pick up her yellow Capri, which a mechanic friend named Bill Cronk was supposed to be working on, he went to find her there. Cronk told him the Capri was gone, that Kopp might be in town, and that he might have it. Appellant decided Kopp must indeed be in town, and began checking "from motel to motel, looking for the yellow car." He spotted it at the Holiday Inn. After ascertaining the correct room number, appellant proceeded to room 153 and saw through the window that Kopp and Nellie were both inside, both, he seemed to emphasize, fully clothed. The Taylors each testified that appellant did not indicate the lights in room 153 had at any time been out. Appellant knocked and entered, and began pushing and slapping his wife, asking both of them, "Why, why ... ?" Remembering he had left his derringer in the Monza, which was parked outside by the Capri, he retrieved it. He then shot Kopp. Though Robert Taylor testified appellant did not say how many times Kopp was shot, Esther was "positive" appellant told her he had shot Kopp twice. She testified, in addition, that appellant and Nellie had been to a marriage counselor and had already decided to separate when the killing took place.
Forensic evidence showed that the recovered slugs had been fired from appellant's derringer, and that appellant had handled the derringer around the time of the killing. Kopp's body revealed no defensive wounds. Physical evidence indicated that the shot that passed through Kopp's shoulder was fired while he was sitting in a chair by the door. The other shot, presumably the second, was fired while the muzzle of the gun was "very close to contact" with Kopp's head. It was also shown that appellant's derringer had to be recocked between shots.
Appellant testified in his own defense. He explained that his marital difficulties stemmed from his inability to find work as a pipefitter and welder. Looking for such *688 work, appellant had gone up to Detroit in May, and had returned to El Paso with the blue Monza to sell. Kopp apparently commuted frequently between Detroit and El Paso. Early one morning, still in May, appellant had arrived home from working night shift at a temporary job to find Kopp lying unexpectedly on his couch. Kopp frequently bragged of his romantic conquests, and appellant had wondered why Kopp never dated when he was in El Paso. Kopp had also boasted of being a martial arts expert.
On the morning of June 6th, Kopp telephoned appellant, supposedly from Detroit, to say he was flying down to sell the Monza to Bill Cronk. In truth, it was shown that Kopp had been checked into the Mesa Motel in El Paso since June 3rd, but that he had moved to the Holiday Inn on the morning of the 6th. Appellant and Nellie spent most of that day running various errands. At 4:45 p.m. Nellie left to make a Tupperware delivery, promising to hurry home so that they could go pick up her Capri from Cronk. When she did not soon return, appellant went to Cronk's to see if Nellie was there, but he found neither her nor the Capri. Cronk told him Kopp might have the car, and was "probably in some motel room with one of his girlfriends." Appellant then went home and called Detroit. When Kopp's roommate there was decidedly uninformative, appellant concluded any woman he might find in a motel with Kopp would probably be his wife. He began to search.
Finding the Capri and Monza parked in front of rooms 151 and 153 of the Holiday Inn, appellant first knocked on Silvester's door. He then knocked at room 153, but the lights were off and no one answered. At that point he went to the front desk, and was eventually directed back to room 153. This time Kopp answered his knock, looking "guilty" and "caught." Kopp informed appellant he had come to take Nellie back to Detroit. Appellant began "yelling and screaming and cussing," and tried to force Nellie to leave with him. When she resisted, he walked out to the Monza. Kopp followed, "leering" and "pissed off." Remembering Kopp's martial arts expertise, appellant pulled out the pistol and exclaimed, "Back off, you son of a bitch." Quickly Kopp calmed down and urged appellant to return to the motel room to discuss matters. Appellant agreed in the hope of getting "another crack" at convincing Nellie to leave with him.
Once inside the room, however, the "screaming and cussing" recommenced. Appellant slapped Nellie and pushed her, and she "ended up on the bed." From the chair by the door, five to seven feet behind appellant, Kopp then proclaimed: "All right, I come down here from Michigan to take Nellie back with me. We've been very intimate and what the fuck are you going to do about it?" As the court of appeals put it, "Appellant showed him:" "I lost it, I really did. I whirled; like I said, I was facing Nellie, I whirled and the next I know Ron is dead or, at least, I think he was dead."
Appellant also testified: "I went blank. I blew up inside."

* * * * * *
"I just lost it, I just exploded."

* * * * * *
"I blew up, I kind of went blank. Everything just erupted. I don't know how to exactly put it."
Appellant professed to have no memory of pulling the trigger, of the number of shots he fired, or of ever putting the gun to Kopp's head.

II.
In making the determination whether sudden passion has been raised in a given case, this Court simply inquires whether there is any evidence, however weak, contested or incredible, which could support a rational jury finding that the accused acted under the immediate influence of sudden passion arising from an adequate cause. E.g., Gonzales v. State, 546 S.W.2d 617 (Tex.Cr.App.1977) In the instant cause there was no question that sudden passion was raisedit was, in fact, the pivotal issue in the case, as final argument of counsel for both sides bears out. *689 Indeed, on this record it would not only have been reversible error to refuse a requested charge on the lesser included offense of voluntary manslaughter, id., it would have constituted fundamental error not to require the jury to find an absence of sudden passion in support of a murder conviction. Lawrence v. State, 700 S.W.2d 208 (Tex.Cr.App.1985); Castillo-Fuentes v. State, 707 S.W.2d 559 (Tex.Cr.App.1986). Here, however, the question is not simply whether sudden passion has been raised. Rather, we must determine whether the evidence in this case was such as to compel a rational jury either to find appellant did in fact act under the immediate influence of sudden passion arising from an adequate cause, or at least to harbor a reasonable doubt that he did notin other words, whether the State satisfied its burden to prove the implied element of absence of sudden passion beyond a reasonable doubt.
The court of appeals was concerned with what it perceived to be "an impossible burden [on] the State" to supply "active disproof of sudden passion ... to the same degree as any affirmative element of the offense of murder." 691 S.W.2d at 763. The court believed such a requirement would unduly impinge upon the jury's prerogative as factfinder simply to reject appellant's assertion of what amounts to "the subjective portion" of sudden passion. Opined the court:
"Appellant's sudden passion claim which provided an abstract basis for jury instruction is nonetheless susceptible of rejection by that body as a fact, thereby eliminating voluntary manslaughter as a verdict. This is the standard of review we endorse in a case such as this."
Id. Accordingly, rather than looking to see whether the evidence would directly bear out an inference of absence of sudden passion, the court of appeals sought and found "affirmative evidence which would support the jury's credibility determinations rejecting the sudden passion claim." Id. Although we affirm its judgment, we must reject the court of appeals' formulation of the standard of appellate review as to the sufficiency of the evidence to prove the absence of sudden passion in a murder prosecution.
This Court has held that a factfinder may not find facts necessary to establishing an element of a criminal offense purely on the basis of its disbelief of the accused's contrary assertions. Wright v. State, 603 S.W.2d 838, 840 (Tex.Cr.App. 1980) (Opinion on appellant's motion for rehearing). Rather, the State has the burden of going forward with evidence to show, and of persuading the factfinder beyond a reasonable doubt of every element of the offense. In Mullaney v. Wilbur, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), while recognizing the difficulty of proving a negative fact, the Supreme Court nevertheless maintained:
"... proving that the defendant did not act in the heat of passion on sudden provocation is similar to proving any other element of intent; it may be established by adducing evidence of the factual circumstances surrounding the commission of the homicide. And although intent is typically considered a fact peculiarly within the knowledge of the defendant, this does not, as the Court has long recognized, justify shifting the burden to him. [citations omitted.]"
421 U.S. at 702, 95 S.Ct. at 1891, 44 L.Ed.2d at 521. Because the issue was raised whether appellant acted "under the immediate influence of sudden passion arising from an adequate cause," the absence of sudden passion became an element of the offense of murder. Bradley v. State, supra. The State must carry the burden of production and persuasion as to that element; the factfinder's rejection of appellant's assertions that he did act under such passion cannot alone supply that element consonant with due process and due course of law.
Nevertheless, applying the standard of review of the sufficiency of the evidence mandated by Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), as appellant importunes us to do, we find the evidence sufficient to meet the State's burden of establishing absence of sudden passion beyond a reasonable doubt. *690 To prove the absence of sudden passion the State may present evidence tending to establish its conversee.g., that at the moment he intentionally or knowingly killed, appellant was capable of, and did in fact act with cool reflection, in spite of circumstances that may well have been provocative.[3] Viewing all of the evidence in the light most favorable to the State, which allows a presumption that the jury invoked its prerogative to discount appellant's own testimony as self-serving, we find that a reasonable jury could have found the absence of sudden passion beyond a reasonable doubt.
As the court of appeals noted, the witnesses who encountered appellant prior to the altercation described him as calm and controlled. Thus, at the time he arrived at the motel and conducted his search there he manifested a cool resolve, in spite of the fact that he admittedly already suspected what he would ultimately find. He took pains to preserve the element of surprise. Later he told his in-laws he discovered Kopp and his wife fully clothed, apparently with the lights on. Though heated words were then exchanged, Silvester's testimony indicates these had subsided eight to ten minutes before the shooting occurred. The only evidence of immediate provocation at that moment is appellant's own testimony relating Kopp's proclamation that he had been "intimate" with appellant's wife. Assuming the jury believed this occurred, appellant's immediate response was to shoot Kopp in the shoulder. The second, fatal shot did not come for ten to fifteen seconds, during which appellant would have found it necessary to recock the derringer, move five to seven feet across the room, and hold the muzzle of the gun close to Kopp's slumping head before pulling the trigger.[4] While we certainly would not hold as a matter of law that ten to fifteen seconds is a sufficient interval for cooling off, it is nevertheless plausible on these facts that, even assuming a momentary loss of composure precipitating the initial gunshot, appellant finished the job in a cool and calculated frame of mind. Resolution of such a question is uniquely the province of the factfinder. So long as we find more than a "mere modicum" of evidence to support it, we must conclude the jury was justified in finding the absence of sudden passion beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. at 319-20, 99 S.Ct. at 2789, 61 L.Ed.2d at 573-74.
Were we to sit as a "thirteenth juror" in this cause, and pass upon the weight and preponderance of the evidence to show absence of sudden passion, we might be inclined to reverse and remand it for a new trial. See Tibbs v. Florida, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). It is clear, however, that this Court does not have such jurisdiction. Combs v. State, 643 S.W.2d 709 (Tex.Cr.App. 1982). Viewing the evidence in the light most favorable to the verdict, we hold that a rational jury *691 could have found the absence of sudden passion beyond a reasonable doubt.
Accordingly, the judgment of the court of appeals is affirmed.
ONION, P.J., concurs in the result.
TEAGUE, Judge, dissenting.
The majority opinion has concluded that "Were we to sit as a `thirteenth juror' in this cause, and pass upon the weight and preponderance of the evidence to show absence of sudden passion, we might be inclined to reverse and remand for a new trial ... It is clear, however, that this Court does not have such jurisdiction. Combs v. State, 643 S.W.2d 709 (Tex.Cr. App.1982)." (Page 690 of opinion.) However, whether or not this Court has such jurisdiction is irrelevant. The issue is whether the court of appeals has jurisdiction to pass upon the weight and preponderance of the evidence to show absence of sudden passion, and how binding that decision might be.
Just recently, Justice Colley of the Tyler Court of Appeals, in Hill v. State, 721 S.W.2d 953 (12th-1986, P.D.R.refused), made the following observation: "The historical fact that the Court of Criminal Appeals has never had `fact' jurisdiction certainly should not be a consideration in the determination of whether the courts of appeal, since September 1, 1981, have had jurisdiction under section 6 to reverse any findings made by a judge or jury in criminal cases when that finding is so contrary to the weight and preponderance of the evidence as to be manifestly wrong and unjust."
In Hill, supra, Justice Colley, at least implicitly, opined to the world in print, respectfully of course, that this Court did not know what it was talking about when it interpreted Art. V, § 6, Texas Constitution, in Combs v. State, 643 S.W.2d 709 (Tex.Cr. App.1982).
Three members of this Court, Judges Roberts, Clinton, and myself did not join the opinion of Combs, supra, only concurring in the result that was reached in that cause. I now find myself in agreement with what Justice Colley stated in Hill, supra, and also find that where this Court probably went astray in Combs, supra, lies in the fact that this Court did not fully and completely understand at that time how factual decisions made by the courts of appeals should be treated by this Court, such obviously occurring because it had not been too long since this Court had lost its virginity on the subject of petitions for discretionary review from decisions by the courts of appeals.
I find that this cause presents an ideal opportunity for this Court to revisit Combs, supra, and Art. V, § 6, supra, and to reconsider the question, whether the Court of Criminal Appeals has jurisdiction to review sufficiency questions once they have been passed on by the Courts of Appeals pursuant to Art. 5, § 6, supra, which provides that decisions of the Courts of Appeals "shall be conclusive on all questions of fact brought before them on appeal or error." Because the majority declines to reconsider the question, I respectfully dissent.
The biggest flaw in the majority opinion lies in what Justice Colley pointed out in Hill, "the High Court may establish definitions of evidentiary sufficiency to be applied in appellate review agreeable to the state constitution, but not one which flies in the face of the plain, strong words of section 6 or one which operates to strip away a convicted defendant's state constitutional right to seek a new trial in the intermediate appellate courts of this State on the ground that the finding of guilt is against the great weight and preponderance of the evidence." Hill, supra, at pages 955-956.
It appears that the controversy is not limited to the Great State of Texas. Just recently, it became necessary for the New York Court of Appeals, which is the "High Court" in the State of New York, in People v. Bleakley and Anesi, 69 N.Y.2d 490, 515 N.Y.S.2d 761, 508 N.E.2d 672 (Ct.App. 1987), to address the issue of what function an intermediate court plays in deciding sufficiency of the evidence questions in criminal cases. There, the distinction between *692 legal sufficiency and weight of evidence was pointed out. The New York Court of Appeals pointed out that though related, they require "a discrete analysis." "For [an intermediate court] to conclude ... that a jury verdict is supported by sufficient evidence, the court must determine whether there is any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury on the basis of the evidence at trial ... and as a matter of law satisfy the proof and burden requirements for every element of the crime charged. If that is satisfied, then the verdict will be upheld by the intermediate appellate court on that review basis. To determine whether a verdict is supported by the weight of the evidence, however, the appellate court's dispositive analysis is not limited to that legal test. Even if all the elements and necessary findings are supported by some credible evidence, the court must examine the evidence further. If based on all the credible evidence a different finding would not have been unreasonable, then the appellate court must, like the trier of fact below, `weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony' ... If it appears that the trier of fact has failed to give the evidence the weight it should be accorded, then the appellate court may set aside the verdict ... Empowered with this unique factual review, intermediate appellate courts have been careful not to substitute themselves for the jury. Great deference is accorded to the fact-finder's opportunity to view the witnesses, hear the testimony and observe demeanor. Without question the differences between what the jury does and what the appellate court does in weighing evidence are delicately nuanced, but differences there are." (515 N.Y.S.2d at 763, 508 N.E.2d at 674-75). As the Senator from Wyoming might put it, "That's powerful stuff for members of this Court to grasp and understand, isn't it?"
In Combs v. State, 643 S.W.2d 709, 716 (Tex.Cr.App.1982), we observed that the proper standard for reviewing sufficiency claims in this Court is that enunciated in Banks v. State, 510 S.W.2d 592, 595 (Tex. Cr.App.1974) (emphasis added):
In reviewing the sufficiency of the evidence to support the conviction, we must view the evidence in the light most favorable to the verdict. In doing so, the verdict will be sustained if there is any evidence which, if believed, shows the guilt of the accused.
This standard is unquestionably a "no evidence" rule, and differs not at all from the standard approved by the United States Supreme Court in Thompson v. Louisville, 362 U.S. 199, 199, 80 S.Ct. 624, 625, 4 L.Ed.2d 654, 655 (1960) (emphasis added):
The ultimate question presented to us is whether the charges against petitioner were so totally devoid of evidentiary support as to render his conviction unconstitutional under the Due Process Clause of the Fourteenth Amendment. Decision of this question turns not on the sufficiency of the evidence, but on whether this conviction rests on any evidence at all.
The problem, of course, is that the Thompson "no evidence" criterion was expressly abandoned by the Supreme Court in Jackson v. Virginia, 443 U.S. 307, 312-313, 320, 99 S.Ct. 2781, 2785-2786, 61 L.Ed.2d 560, 569, 574 (1979) (emphasis in original):
We granted certiorari to consider the petitioner's claim that under In re Winship, [397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970)], a federal habeas corpus court must consider not whether there was any evidence to support a state-court conviction, but whether there was sufficient evidence to justify a rational trier of the facts to find guilt beyond a reasonable doubt.

* * * * * *
That the Thompson "no evidence" rule is simply inadequate to protect against misapplications of the constitutional standard of reasonable doubt is readily apparent. "[A] mere modicum of evidence may satisfy a `no evidence' standard ..." Jacobellis v. Ohio, 378 US 184, 202, 12 L Ed 2d 793, 84 S Ct 1676 [1686], 28 Ohio Ops 2d 101 (Warren, C.J., dissenting). Any evidence that is relevantthat has *693 any tendency to make the existence of an element of a crime slightly more probable than it would be without the evidence, cf. Fed Rul Evid 401could be deemed a "mere modicum." But it could not seriously be argued that such a "modicum" of evidence could by itself rationally support a conviction beyond a reasonable doubt. The Thompson doctrine simply fails to supply a workable or even a predictable standard for determing whether the due process command of Winship has been honored.
Nevertheless, in Combs, supra at 716-717 (emphasis in original), this Court read Jackson to be in accord with the "no evidence" standard of Banks, supra, which is identical to the doctrine of Thompson, overruled by the Supreme Court in Jackson:
Clearly, the federal constitutional standard is also a question of law and does not involve any weighing of the evidence... Thus, the sufficiency of the evidence to sustain criminal convictions as determined by this Court is a question of law under both state and federal standards.
The anomaly is striking. If the standards of both Jackson and Banks are, indeed, "question[s] of law," the only thing that is clear is that they are dramatically different "question[s] of law." Moreover, the federal standard plainly does require a certain "weighing of the evidence":
A federal court has a duty to assess the historic facts when it is called upon to apply a constitutional standard to a conviction obtained in a state court. For example, on direct review of a state court conviction, where the claim is made that an involuntary confession was used against the defendant, [the Supreme Court] reviews the facts to determine whether the confession was wrongly admitted in evidence. [Citations omitted] The same duty obtains in federal habeas corpus proceedings. [Citations omitted]
Jackson, supra at 443 U.S. 318, 99 S.Ct. 2788, 61 L.Ed.2d 573 (emphasis added).
And this is precisely what the Court then proceeded to do in Jackson, after first determining the proper constitutional standard for reviewing evidentiary sufficiency. Surely, the result would have been the same even under the rule of Thompson. Yet the standard applied to reach that result is undoubtedly not the Thompson standard. Had there been no more than a modicum of evidence supporting conviction, even absent any exculpatory testimony, the result would certainly have been very different than that required by Thompson.
It follows from this that a reviewing court cannot avoid assessing the weight and credibility of evidence adduced at trial, not to reach a subjective judgment of its implications, but to determine whether a known subjective judgment of the institutional factfinder was rational. This constitutes appellate review of the facts.
Having said that, there is some authority for the proposition that the Texas Constitution does not confer upon this Court the authority to review findings of fact. As we also observed in Combs, supra at 716 (emphasis in original):
It is well settled that our Court does not have jurisdiction to pass upon the weight and preponderance of the evidence or "unfind" a vital fact. Martin v. State, 605 S.W.2d 259 (Tex.Cr.App.1980); White v. State, [591 S.W.2d 851 (Tex.Cr. App.1979) ]. More specifically, our determinations of sufficiency of the evidence have never involved passing upon the weight and preponderance of the evidence.1
1 We perceive no other standard may be utilized by the Court of Appeals in reviewing criminal convictions other than sufficiency of the evidence to support conviction.
Of particular interest here is the claim that we may not "unfind" a fact. No one seriously contends that this or any other appellate court in Texas may constitutionally try a case de novo on appeal. It is simply not within our power or authority to redo a job already done by a factfinder in the trial court, regardless of how well or poorly that job was done. But it is ordinarily within the power of an appellate tribunal to require that a poor or inadequate job be redone by a duly empowered *694 factfinder at the trial court level. It is, therefore, perplexing at best to say that a fact has not been "unfound" whenever a cause is reversed for insufficient evidence. Surely we do not mean to say that the unsupported or inadequately supported findings of fact are to be let stand.
All of this would be of semantical interest only were it not for the fact that our opinion in Combs plainly intended the word "unfind" to have the meaning attached to it by Justice Calvert in his article, "No Evidence" and "Insufficient Evidence" Points of Error, 38 TEX.L.REV. 361 (1960). Consider the following brief course in elementary civil procedure for appellate review of evidentiary questions, excerpted from Justice Calvert's article at page 372:
1. If reversal of a trial court's judgment and rendition of judgment for appellant is sought and a proper procedural predicate is laid for that result, the point should be that there is no evidence of probative force to support the finding of the vital fact. If through carelessness or otherwise counsel states the point in terms of "insufficient" evidence, courts should interpret the language as meaning legally insufficient.
2. If reversal of a trial court's judgment and a remand of the cause for retrial is sought on the ground that the only evidence adduced is that offered to prove the existence of a vital fact and that it is factually too weak to support the finding, the point should be that the evidence is insufficient to support the finding of the vital fact. In ruling on the point the courts should speak of the sufficiency or insufficiency of the evidence to support the finding.
3. If evidence has been adduced to prove the existence of the vital fact and to disprove its existence and a reversal of the trial court's judgment and remand of the cause for retrial is sought, the point of error should be that the finding of the vital fact is so contrary to the great weight and preponderance of the evidence as to be clearly wrong. In deciding the point the courts should speak in the same terms.
4. If the language of a point of error leaves the Court of Civil Appeals in doubt as to whether it is a "no evidence" point, an "insufficient evidence" point, or a "preponderance of the evidence" point, the Court should resolve the doubt by looking to the procedural predicate for the point, the argument under the point, and the prayer for relief.
5. Courts of Civil Appeals should carefully avoid the use of "no evidence" rules of decision in deciding "insufficient evidence" and "preponderance of the evidence" points of error. While their use may be harmless if the point is sustained, they are not proper rules for that purpose.
Until 1978 this Court routinely remanded cases for retrial after finding the evidence insufficient to support conviction. Now, of course, we order that a judgment of acquittal be entered instead so as to avoid offending the Double Jeopardy Clause of our federal constitution. Those double jeopardy cases which impinge somehow on the rule of Jackson begin with Burks v. United States, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978), and Greene v. Massey, 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978). The first most important thing to remember is that these cases were decided before Jackson. Consequently, the Due Process Clause did not yet require a reversal of criminal convictions founded upon "insufficient evidence," as that term later came to be used in Jackson. Instead, due process required reversal only when the prosecution had adduced "no evidence" to prove one or more essential elements of the crime. See, Thompson, supra.
Nevertheless, Burks presaged Jackson in a few subtle ways. First, throughout the opinion the Chief Justice repeatedly spoke of "evidentiary insufficiency" without much elaboration. Since the case arose in the federal system, one might suppose that the term had a common, well-understood significance in that context.
Fed.Rule Crim.Proc. 29(a), with emphasis added, provides in part that the: [t]rial court on motion of a defendant or of its own motion shall order the entry of *695 judgment of acquittal of one or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses.
The rules do not further define the meaning of "insufficient evidence."
The District Court denied Burks' motion to this effect, but the Court of Appeals reversed, holding that the government had not met its burden, since the prosecutor's evidence with respect to Burks' mental condition, even when viewed in the light most favorable to the government, did not "`effectively rebut[ ]' petitioner's proof with respect to insanity and criminal responsibility." Burks, supra at 437 U.S. 4, 98 S.Ct. 2143, 57 L.Ed.2d 5. The case was remanded to the trial court for determination of whether Burks should be retried. Burks thought this action violated the Double Jeopardy Clause, and took his claim to the Supreme Court, which
granted certiorari to resolve the question of whether an accused may be subjected to a second trial when conviction in a prior trial was reversed by an appellate court solely for lack of sufficient evidence to sustain the jury's verdict.
Initially, it was noted that the Court of Appeals had made a determination of factual insufficiency:
It is unquestionably true that the Court of Appeals' decision "represent[ed] a resolution, correct or not, of some or all of the factual elements of the offense charged."
Next, it was observed that the Court of Appeals' holding was that the evidence should have been held insufficient by the trial court on Burks's motion for acquittal:
If the District Court had so held in the first instance, as the reviewing court said it should have done, a judgment of acquittal would have been entered and, of course, petitioner could not be retried for the same offense.
In this procedural context, it is obvious that no constitutional standard of evidentiary sufficiency was even in question. Since the federal rules require that an acquittal is necessary when evidence of guilt is "insufficient," and since the Court of Appeals had held the evidence "insufficient" within the meaning of these rules, and since the Supreme Court was not called upon to decide whether the Court of Appeals had applied the correct standard of evidentiary sufficiency under the rules, the double jeopardy question could be, and was in fact, resolved by the Supreme Court without passing at all upon the proper constitutional or statutory rule of evidentiary sufficiency. The importance of this fact cannot be stressed too strongly.
Still, the Court indicated in footnote 10 that
[i]n holding the evidence insufficient to sustain guilt, an appellate court determines that the prosecution has failed to prove guilt beyond a reasonable doubt.
Of course, even this much can be said whether the appellate court uses a Thompson standard or a Jackson standard. It tells us nothing about which standard is required by due process, let alone which standard was used by the Court of Appeals in Burks.
Yet, there are other clues. Consider the following:
Moreover, such an appellate reversal means that the government's case was so lacking that it should not have even been submitted to the jury. Since we necessarily afford absolute finality to a jury's verdict of acquittalno matter how erroneous its decisionit is difficult to conceive how society has any greater interest in retrying a defendant when, on review, it is decided as a matter of law that the jury could not properly have returned a verdict of guilty.
Oddly enough, neither Burks nor Greene bars retrial after a finding of "insufficient evidence," as that phrase is understood in Jackson. Both cases, and especially Greene, presuppose a "no evidence" standard for reversal. That a retrial under such conditions should be prohibited is a very different thing than that a retrial after reversal for "insufficient evidence" under Jackson should be prohibited.
*696 Much of the problem, in retrospect, turns upon the notion of insufficiency "as a matter of law." It is difficult not to think of the "no evidence" rule when this language is used, in spite of the fact that the standard of review was not an issue in Burks and that Greene was remanded for consideration in light of Burks partly because the Florida standard of review was unclear.
Subsequent cases have simply assumed that reversal under Jackson prevents retrial under Burks and Greene. But there is really no authoritative holding to this effect, setting out the constitutional argument for such a result. Indeed, given the recent holding in Tibbs v. Florida, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982), that the Double Jeopardy Clause does not bar retrial after a conviction is reversed on appeal as against the weight and preponderance of the evidence, the proposition itself is subject to considerable doubt. In short, it may be the case that double jeopardy prevents retrial only when the appellate court reverses for "no evidence," not when it reverses for "insufficient evidence," as that term was understood by the Jackson Court.
Throughout the opinion in Tibbs, "legal insufficiency" and "insufficiency as a matter of law" are used to describe a standard like that articulated in Jackson. The Supreme Court, moreover, quotes with approval language from an Eighth Circuit opinion which seems to apply the Jackson rule. Part of that language is: "The evidence need not exclude every reasonable hypothesis except that of guilt ..." Tibbs, supra at 457 U.S. 38, n. 11, 102 S.Ct. 2216, n. 11, 72 L.Ed.2d 658-659, n. 11, quoting United States v. Lincoln, 630 F.2d 1313 (8th Cir.1980).
Tibbs characterizes Burks and Greene as carving a narrow exception for "legal insufficiency" to the general proposition that double jeopardy will not bar retrial of an accused who successfully reverses his conviction on appeal. A good deal of selected quotation from Burks then follows, presumably intended to elaborate upon the meaning of "legal insufficiency." It concludes with the statement:
A reversal based on the insufficiency of the evidence has the same effect [as an acquittal] because it means that no rational factfinder could have voted to convict the defendant. . . . That rational men disagree is not in itself equivalent to a failure of proof by the State, nor does it indicate infidelity to the reasonable-doubt standard.
Tibbs, supra at 457 U.S. 41-42, 102 S.Ct. 2217-18, 72 L.Ed.2d 661.
Finally, almost as an afterthought, a brief discussion of Jackson appears:
[O]ur decision in Jackson v. Virginia, 443 US 307, 61 L Ed 2d 560, 99 S Ct 2781 (1979), places some restraints on the power of appellate courts to mask reversals based on legally insufficient evidence as reversals grounded on the weight of the evidence. We held in Jackson that the Due Process Clause forbids any conviction based on evidence insufficient to persuade a rational factfinder of guilt beyond a reasonable doubt. The Due Process Clause, in other words, sets a lower limit on an appellate court's definition of evidentiary insufficiency.
The first sentence of this passage was evidently meant to caution against mischaracterization of a "modicum" of evidence as being "legally sufficient." Since even a modicum weighs more than nothing, reversal when there exists a modicum of inculpatory evidence might be characterized as a reversal for lack of evidentiary weight, as indeed it is. But it is not a reversal based on conviction against "the weight of the [exculpatory] evidence."
The former method, prescribed by Jackson, requires more than a "mere modicum" of inculpatory evidence. One need not look to the exculpatory evidence to apply this criterion. In the latter method, it is clear the Supreme Court has in mind a weighing of inculpatory against exculpatory evidence. This is a method not prescribed by Jackson, and reversal grounded upon it does not bar retrial.
The clear implication is that reversal for what the Court now calls "legal insufficiency" under the rule of Jackson does bar retrial. But it is hard to see what is meant *697 by a "lower limit on ... [the] definition of evidentiary sufficiency," unless it is meant that there is a lower limit below which the quantity or weight of inculpatory evidence may not fall and still be "legally sufficient" to support a conviction. If this is a correct reading of the Court's meaning, it is consistent with Jackson. The only analytical problem is the use of the phrase "legal insufficiency" to describe the Jackson standard. Henceforth, in this opinion, I will use the term "constitutional insufficiency" or simply "insufficiency of the evidence" to distinguish the Jackson rule from the "no evidence" rule, which is often called the standard of "legal insufficiency" in Texas.
Historically, the Texas Court of Criminal Appeals has always used the "no evidence" standard to review evidentiary sufficiency. The fact that we continue to do so after Jackson is puzzling. Since, in the past, the only sufficiency standard against which this Court ever evaluated evidence on appeal was that of "legal insufficiency," it was natural after a time for the Court to drop the word "legal" from its written opinions in many cases.
The Courts of Civil Appeals, on the other hand, were long empowered to assess both "legal insufficiency" and "factual insufficiency" of evidence adduced at trial. The former, however, is and has been for some time routinely and almost exclusively denominated "no evidence" in the opinions of the Texas Supreme Court and intermediate appellate courts. Accordingly, the word "factual" is nearly always dropped from the latter, since it no longer marks a distinction of any importance in civil cases.
The result has been that the Texas Supreme Court and Courts of Civil Appeals always meant something very different by the phrase "sufficiency of the evidence" than did the Texas Court of Criminal Appeals. Indeed, the divergence of definition is evidently of such antiquity that almost no one on either side now realizes that he means something different by the phrase than does everyone on the other side.
This would long since have produced disastrous consequences except that neither side has had much occasion until recently to talk officially with the other. The Court of Criminal Appeals has always had exclusively criminal jurisdiction. The Supreme Court and, until a few years ago, the Courts of Civil Appeals always had jurisdiction which was exclusively civil. Consequently, neither side was ever called upon to review a decision of the other. Since it was not necessary that the civil courts read and understand what was said by the criminal court, or vice versa, no misunderstanding of legal terminology ever arose. In fact, either side might have conducted all its business in French for all the effect it would have had upon the other.
This is no longer the case, however. The Courts of Civil Appeals were renamed "Courts of Appeals" and given intermediate appellate jurisdiction in criminal as well as civil cases. An official dialogue instantly arose between these courts and the Court of Criminal Appeals, since the latter now reviews the decisions of the former in criminal cases. And, as might have been expected, the two sides now misunderstand one another perfectly.
In its capacity as final arbiter of the criminal law in Texas, the Court of Criminal Appeals might soon have made it clear to the intermediate courts that the sufficiency of evidence in criminal cases is to be judged by what is known in civil courts as the "no evidence" standard. Indeed, the standard was quickly impressed upon the Courts of Appeals, although the Court of Criminal Appeals has yet to realize that what it calls "insufficient evidence" is a thing very different from "insufficient evidence" in civil practice. By and large, the intermediate appellate courts have been able to follow the rule, although one might easily sympathize with their inability to understand its epithet.
This would have been well enough had not the United States Supreme Court, at about the same time, decided to reinterpret due process such that the quantum of evidence necessary to sustain a criminal conviction was increased. No longer were state convictions to be evaluated against the "no evidence" standard, but rather against an "insufficiency of the evidence" *698 standard. There is, of course, no special reason for believing that this decision was anything but coincidental. Still, happening as it did very nearly when the Courts of Appeals acquired their new and unfamiliar jurisdiction in criminal cases, its effect was to exacerbate the problem of legal terminology in Texas criminal jurisprudence.
Naturally, the Courts of Appeals read Jackson to require a review for "factual insufficiency," a thing they were well practiced at. The Court of Criminal Appeals, however, was quick to reveal that it had no idea what this meant, confusing it at once with "against the great weight and preponderance of the evidence," another standard of evidentiary review well known to the civil courts and which differs in significant substantive and procedural ways both from the "no evidence" standard and from the "insufficiency of evidence" standard.
Nevertheless, as we have seen, the Court of Criminal Appeals asserted that the Jackson rule was a "sufficiency of the evidence" standard, just like the one it had been applying all along. But the United States Supreme Court was not speaking this language at all. Rather, it was speaking the language of the Texas Supreme Court and Courts of Appeals, and it meant by "sufficiency of the evidence" not "legal sufficiency" but "factual sufficiency." That this is so is evident from a straightforward reading of the majority and concurring opinions in Jackson. The failure of the Court of Criminal Appeals to perceive it can only be attributed to its ignorance of the fact that "sufficiency of the evidence" has long meant "factual sufficiency" everywhere but in the criminal courts of Texas.
Thus, in point of federal constitutional law, the Due Process Clause prohibits the conviction of an accused person upon evidence which is "factually insufficient" to persuade any rational factfinder beyond reasonable doubt that the accused is guilty. This is not to say that the U.S. Constitution also prohibits conviction "against the great weight and preponderance of the evidence." Indeed, as should be clear by now, the recent case of Tibbs, supra, strongly suggests that it does not, for while a "factual insufficiency" prevents retrial, a conviction which is merely "against the great weight and preponderance of the evidence" does not. The distinction may at first seem to elude common sense, but once again I find it to be a familiar and satisfactory basis for different results in Texas civil practice, and Justice Calvert explains it quite clearly.
A "sufficiency of the evidence" standard requires a weighing of the inculpatory evidence alone. If this evidence is not heavy enough, the conviction must be reversed. A "weight and preponderance of the evidence" standard requires a weighing of the inculpatory evidence against the exculpatory evidence. If the latter greatly outweighs the former, those states which apply this standard to criminal cases as a matter of state law may, but are not required by due process, to reverse the conviction.
In this connection, another aberration of Texas criminal practice appears. Consider the proposition of Carlsen v. State, 654 S.W.2d 444, 449 (Tex.Cr.App. 1983) (on State's motion for rehearing), that
... if the evidence supports an inference other than the guilt of the appellant, a finding of guilt beyond a reasonable doubt is not a rational finding. And again at pp. 449-450 (emphasis in original):
If the State's evidence supports an inference other than a finding of the essential elements of the crime, then no trier of fact could rationally find the accused guilty beyond a reasonable doubt and this is true irrespective of the character of the evidence.
Without more, this holding accomplishes two extrapolations from Jackson, only one of which is plainly required by the Due Process Clause: (1) it seems to focus only on evidence adduced by the State, which under most but not all conceivable circumstances could be fairly described as inculpatory evidence; and (2) it mandates reversal when the evidence under consideration gives rise to multiple inferences, all of which may be reasonable but not all of which establish guilt.
*699 The second of these propositions is almost certainly not required by Jackson:
Only under a theory that the prosecution was under an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt could this petitioner's challenge be sustained. That theory the Court has rejected in the past. Holland v. United States, 348 US 121, 140, 99 L Ed 150, 75 S Ct 127 [138]. We decline to adopt it today. Under the standard established in this opinion as necessary to preserve the due process protection recognized in Winship, a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume even if it does not affirmatively appear in the recordthat the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.
Jackson, supra at 443 U.S. 326, 99 S.Ct. 2792-2793, 61 L.Ed.2d 578.
One might attempt to square Carlsen with this language from Jackson by maintaining two positions. First, it might be surmised that, while the Due Process Clause does not require the exclusion of every hypothesis inconsistent with guilt, it does require exclusion of every reasonable hypothesis inconsistent with guilt. Carlsen, however, does not speak of reasonable hypotheses, but only of "an inference other than guilt." Furthermore, the United States Supreme Court, prior to the Carlsen decision, quoted with approval the following language from United States v. Lincoln, 630 F.2d 1313, 1316 (8th Cir.1980): "The evidence need not exclude every reasonable hypothesis except that of guilt." Tibbs, supra at 457 U.S. 31, 38, n. 11, 102 S.Ct. 2211, 2216, n. 11. It is, therefore, unlikely that any significance should be attached to the failure of the Jackson Court to use the word "reasonable."
Second, it might be thought that Carlsen did not mean "conflicting inference" when it said "an inference other than guilt." By this reckoning, there is no conflict when an internally consistent body of evidence is simply ambiguous. Such evidence merely gives rise to more than one reasonable inference. But clearly under these circumstances, even if it can be intelligently maintained that the evidence does not conflict, it would stretch credulity to insist that the inferences do not conflict. One warrants a conclusion of guilt; the other a conclusion of innocence. What could be more conflicting than that?
Ironically, the "exculpatory inference" analysis transcends the "no evidence" review of Banks/Combs and the constitutional sufficiency review of Jackson to require a criminal law equivalent of the "weight and preponderance" review often encountered in Texas civil practice. In effect, it obliges the reviewing court to compare the inculpatory evidence and inferences with the exculpatory evidence and inferences to determine, not whether the latter greatly outweighs the former, but whether a reasonable exculpatory inference remains. This task differs from a "weight and preponderance" review only insofar as it takes account of the higher standard of proof in criminal cases. But both procedures clearly contemplate a review of the record not required by Jackson.
Accordingly, the holding of Carlsen is in error to the extent that it relies upon Jackson. On the other hand, if there is an independent state ground for the holding, there is nothing in Jackson disapproving it. Otherwise, it must be overruled. What remains is to determine whether the Texas Constitution authorizes either the Court of Criminal Appeals or the Courts of Appeals even to perform the "factual sufficiency" review which is required by Jackson, let alone the "exculpatory inference" review of Carlsen. Although this question has already been answered in the negative, it should by now be apparent that the holding of Combs in this regard was based upon a flawed premise.
For the above and foregoing reasons, it is now time for this Court to revisit Combs and Carlsen, supra, in light of Art. V., § 6 of the Texas Constitution. To the majority's failure to do so, I respectfully dissent.
NOTES
[1] The relationship is peculiar in that at least facially the "lesser included offense" of voluntary manslaughter under V.T.C.A. Penal Code, § 19.04, actually consists of murder plus an element. This Court has held that when there is evidence in a murder prosecution raising the issue whether the accused killed "under the immediate influence of sudden passion arising from an adequate cause," the absence of such "sudden passion" becomes an implied element of murder which the State must establish beyond a reasonable doubt in order to obtain a conviction for murder under V.T.C.A. Penal Code, § 19.02. Bradley v. State, supra. In a prosecution for voluntary manslaughter, on the other hand, the State must prove exactly what it alleges, viz: the presence of "sudden passion" beyond a reasonable doubt.

We are aware that our Braudrick/Bradley construct is less than perfect. For example, it is at least theoretically possible that a jury instructed in conformity with our holding in Cobarrubio could, having a reasonable doubt that the accused acted in the absence of sudden passion, acquit him of murder. Proceeding to the voluntary manslaughter paragraph of the charge, the same jury might have a reasonable doubt that the accused in fact did act under the influence of sudden passion, and thus be compelled to acquit of that offense as well. In other words, a jury unable to resolve its reasonable doubt one way or the other as to the presence or absence of sudden passion, would find itself in the anomalous position, presuming (as we must) that it follows the court's instructions to the letter, of exonerating a person it otherwise found had intentionally or knowingly caused the death of another.
Again we must emphasize that, as in Bradley, 688 S.W.2d at 853, n. 13, this "ludicrous position" is a product of the Legislature's having fashioned voluntary manslaughter as an offense in its own right, rather than making "the influence of sudden passion arising from an adequate cause" an issue of mitigation to be raised at the punishment stage in a murder prosecution, see Daniel v. State, 668 S.W.2d 390 (Tex.Cr. App.1984) (Miller, J., concurring), or an "affirmative defense" to murder, see Patterson v. New York, 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977). We again invite the Legislature to address this matter.
[2] The car proved to be a Chevrolet Monza, with Michigan plates, registered to Kopp. Appellant had driven it down from Detroit the month before in an effort to sell it for Kopp in EI Paso. He had been driving the Monza while his wife's car was being repaired. Subsequent to the killing the derringer was found, holstered, in the right rear floorboard of the Monza. This was not the vehicle in which appellant had apparently arrived at the motel, however, for his green 1967 Chevrolet truck was subsequently discovered in the parking lot.
[3] There are, of course, various bases upon which a properly instructed jury could reject sudden passion, though the issue was undoubtedly raised by the evidence. First:

"[i]f the jury finds there was no provocative conduct, or at least none occuring at the time of the offense, then of course there is no finding of cause at all, much less `adequate cause.' Alternatively, the jury could find there was provocative conduct, even adequate to render an ordinary man incapable of cool reflection, but that nonetheless, the defendant himself acted coolly and deliberately. Finally, it could find there was provocative conduct, that the defendant was in fact provoked, but that the provocation was not such as would render a man of ordinary temper incapable of cool reflection."
Gonzales v. State, 717 S.W.2d 355, 361 (Tex.Cr. App.1986) (Clinton, J., dissenting). Any one of these variants would justify a finding of absence of sudden passion in support of a murder conviction under Bradley v. State, supra.
[4] At final argument the jury was invited to consider the fact that under the law as it stood when the case was tried, though appellant's wife was incompetent to testify against him, she could have been called to testify in his behalf, but was not. Former Article 38.11, V.A.C.C.P. Presumably she could have related a "shorthand rendition" of what appellant's state of mind seemed to be when he killed Kopp. See, e.g., Jones v. State, 47 Tex.Cr.R. 515, 85 S.W. 5 (1905). That she did not would tend to indicate she had nothing to relate that would show sudden passion, and it was permissible to urge the jury to view the evidence with this in mind. E.g., Fisher v. State, 511 S.W.2d 506 (Tex.Cr.App. 1974).