Affirmed and Majority and Dissenting Opinions filed February 28, 2006









Affirmed
and Majority and Dissenting Opinions filed February 28, 2006.

 

 

 

In The

 

Fourteenth Court of Appeals

_______________

 

NO. 14-04-00485-CR

_______________

 

MATTHEW DAVID KELLEY, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

________________________________________________

 

On Appeal from the 23rd District Court

Brazoria County, Texas

Trial Court Cause No. 43,498

________________________________________________

 

D I S S E N T I N G  
O P I N I O N

Because
the evidence is legally insufficient to support appellant=s conviction for recklessly causing
serious bodily injury to a child, I respectfully dissent.








Significantly,
the State did not introduce testimony from an expert in shaken baby syndrome or
head trauma.  Instead, the jury reviewed
diagnostic information directly from a pediatrician, a radiologist, and an
ophthalmologist concerning factors such as the baby=s blood-clotting abnormalities and
the location of the subdural hematoma. 
However, the jury was not qualified to evaluate the diagnostic
information in relation to the force of the conduct that caused the
injuries.  Because the State failed to
establish a forensic link between the baby=s medical diagnosis and reckless
conduct on the part of appellant, there is no evidence from which a rational
jury could conclude beyond a reasonable doubt that appellant was aware of but
consciously disregarded a substantial and unjustifiable risk. 

At
trial, the pediatrician testified that the baby presented with a
coagulopathy.  She further explained that
three of the baby=s coagulation factors tested outside the normal range and
indicated a blood-clotting abnormality.[1]  However, the jury was unable to evaluate the
impact of the baby=s coagulopathy on the amount of force likely to have caused
the baby=s injuries.  At a voir dire hearing outside the presence
of the jury, the pediatrician testified that she did not know the amount of
force it would take to cause the baby=s injuries.  In describing the amount of force to cause
shaken baby syndrome in general terms, she stated it was a rotational movement
that caused the injury, which is why someone not very large or forceful could
cause shaken baby syndrome.  She stated
repeatedly that it would not take much physical force to cause the
syndrome.  At the conclusion of the
hearing, the judge ruled that he would not allow any type of demonstration or
testimony from the pediatrician concerning the amount of force necessary for
the baby to sustain her injuries. 








No other
expert testified as to the amount of force, either specifically or generally,
that could cause shaken baby or shaken impact syndrome.  The ophthalmologist and a local physician
were not asked and did not address the question.  The radiologist testified that he could not
determine how much force it would take to cause an injury to the baby.  When questioned about the baby=s abnormal blood-clotting factors,
the radiologist testified that the factors were Atoo much spaghetti@ for him, and Athe coagulopathy and what roll [sic]
it plays in it is the clinician=s job.@  As a general matter,
however, he testified that in cases where a blood disorder is found, the trauma
causing the bleeding may be Aless than it would be in a normal person.@ 


Throughout
the trial, the State=s experts referred to Dr. Lukefahr, a specialist consulted in
the case.  Dr. Lukefahr was described by
the State and the pediatrician as a UTMB specialist in shaken baby syndrome and
expert in forensic medicine, but he was not called to testify.[2]  On voir dire, the pediatrician stated that
Dr. Lukefahr was the expert qualified to answer questions related to the force
of conduct involved in shaken baby or shaken impact syndrome.  At trial, she testified that the baby was
referred to Dr. Lukefahr, and Dr. Lukefahr is routinely called for consultation
when shaken baby syndrome is the suspected diagnosis.[3]  At closing, the State argued that Dr. Lukefahr
was not needed at trial because the jury had Athe same information.@ 
However, unlike Dr. Lukefahr, the jury did not have the expertise to
evaluate that information.








Both the
pediatrician and the radiologist testified that the baby=s records indicated that Dr. Lukefahr
inferred from diagnostic information that the baby suffered a contusion and
listed the baby=s diagnosis as Ashake-impact@ syndrome.[4]  The radiologist explained that when there was
an impact, a contusion and skull fracture would typically appear on one side of
the head, but a subdural hematoma would appear on the opposite side because Athe brain gets compressed against the
skull as it reverberates from the injury.@ 
He further testified that shaken baby syndrome was usually more
consistent with bilateral subdural hematomas or internal bleeding on both sides
of the head.  Here, the baby=s CT and MRI scans revealed that she
had a unilateral subdural hematoma located on the right side of her head.  The radiologist testified that there was no
evidence from which to infer a contusion or external trauma. Other experts also
testified that there were no broken or fractured bones, burns, cuts, bruises,
or any other evidence that indicated external trauma to the head. 

Again,
because Dr. Lukfahr did not testify and the State did not present testimony
from another qualified expert in head trauma, the jury had no factual basis to
evaluate the significance of the diagnostic findings relative to criminal
liability.  Specifically, the jury could
not assess whether the location of the subdural hematoma and the absence of
bone fractures or other symptoms associated with shaken baby syndrome were
findings more consistent with injuries caused by violent shaking or injuries
caused by movements within the normal range of conduct. 

The
majority holds that there is legally sufficient evidence to support appellant=s conviction because the State=s experts ruled out the possibility
that the baby=s injuries were caused by an Aaccident.@ 
On the day of the alleged offense, appellant called the baby=s mother and told her that he thought
they should take the baby to the doctor because Ashe seemed kind of like a passed-out
state [sic]@ and she Aslumped over@ on the changing table. However,
appellant did not contend that the baby=s injuries were caused when she
slumped over on the changing table. 
Rather, appellant argued that the medical experts could not determine
what caused the baby=s injuries, or that the injuries were caused by re-bleeding
from a traumatic forceps delivery that resulted in massive bruising on the
right side of her head (the same side as the subdural hematoma). 








Moreover,
even if the jury viewed the State=s evidence of appellant=s statements as an exculpatory
attempt, mere disbelief of exculpatory evidence does not relieve the State of
its burden to prove all of the elements of the offense.  Gold v. State, 736 S.W.2d 685, 689
(Tex. Crim. App. 1987), overruled in part on other grounds, Torres v. State,
785 S.W.2d 824, 825 (Tex. Crim. App. 1989). 
Here, the testimony as to appellant=s statements revealed no
inconsistencies which would indicate his statements were false.  There is also no evidence that appellant
attempted to conceal the baby=s injuries from anyone or delay medical treatment.  Nor is there evidence that appellant ever
became angry or  upset or lost control of
his temper.  To the contrary, the baby=s mother testified that appellant
denied doing anything to hurt the baby. 
She also testified that she and appellant both loved the baby, and she
had never seen appellant shake or cause injury to the baby.

Because
there was no evidence from which a lay person could infer that appellant
recklessly caused the baby=s injuries, the State could not prove its case without the
testimony of an expert.  In the absence
of such testimony, the jury was unable to evaluate the significance of the
diagnostic factors in relation to the physical force sufficient to cause the
baby=s injuries.  Without this crucial link between medical
diagnosis and criminal culpability, a rational jury could not find beyond a
reasonable doubt that appellant recklessly caused the baby=s injuries.  Therefore, I would find the evidence legally
insufficient to support appellant=s conviction, reverse the judgment of
the trial court, and render a judgment of acquittal.

 

/s/        Charles
W. Seymore

Justice

 

Judgment rendered and Majority and
Dissenting Opinions filed February 28, 2006.

Panel consists of Justices Hudson,
Edelman, and Seymore.  (Hudson, J.,
majority.)

Publish C Tex.
R. App. P. 47.2(b).

 











[1]  The
pediatrician specified the AD-dimer, the FDP, and the fibrinogen@ as the abnormal clotting factors.  She also testified that small bruises were
found on the baby=s cheek and left ear. 
When the baby=s mother was questioned about the bruising, she said
she thought Ababies bruise easily.@ In
addition, the baby was readmitted to the hospital approximately five weeks
after the alleged child abuse when a follow-up exam revealed an Aincreased right subdural hematoma.@  The baby was
in State custody at the time the subsequent bleeding occurred.  

 





[2]  There was no
indication in the record as to why the State did not call Dr. Lukefahr as a
witness.





[3]  She further
testified that per Dr. Lukefahr=s request, among other things, the baby was tested for
a rare inheritable disease with symptoms similar to shaken baby syndrome.  However, she did not know the results of the
test, and stated again that Dr. Lukefahr was the expert qualified to testify
regarding the disease.





[4]  The record
indicates that the terms Ashaken impact syndrome@and Ashaken baby syndrome@ reflect
two different schools of thought.  With
respect to shaken baby syndrome, the view is that shaking alone is enough to
cause the injuries consistent with the syndrome.  With respect to shaken impact syndrome, the
view is that the shaking must be accompanied by an impact of some sort.