**AFFIRMED; Opinion Filed August 13, 2018.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-17-00169-CR

**MANUEL FINO, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court No. 7**
**Dallas County, Texas**
**Trial Court Cause No. F16-30419-Y**

## MEMORANDUM OPINION

Before Justices Lang, Myers, and Stoddart
Opinion by Justice Myers

A jury convicted appellant Manuel Fino of murder and assessed punishment at thirty years' imprisonment. Appellant brings twelve issues in this appeal contending the trial court erred in failing to instruct the jury that it must unanimously reject sudden passion; the trial court erred in rejecting his *Batson* challenge; the evidence was insufficient to disprove self-defense and defense of another; the jury's rejection of sudden passion is not supported by legally or factually sufficient evidence; the trial court erred in failing to instruct the jury that it could consider the prior relationship between appellant and the deceased in determining whether appellant acted in self-defense and defense of a third party; the trial court erred in failing to conduct a hearing on his amended motion for new trial; and the court violated appellant's statutory and constitutional rights by admitting appellant's involuntary videotaped statements. We affirm.

## BACKGROUND

Appellant was indicted for murder. The indictment against him alleged as follows:

That MANUEL FINO, hereinafter called Defendant, on or about the 16th day of April, 2016 in the County of Dallas, State of Texas, did unlawfully then and there intentionally and knowingly cause the death of JESUS VEGA, an individual, hereinafter called deceased, by SHOOTING DECEASED WITH A FIREARM, a deadly weapon,

And further did unlawfully then and there intend to cause serious bodily injury to JESUS VEGA, hereinafter called deceased, and did then and there commit an act clearly dangerous to human life, to-wit: by SHOOTING DECEASED WITH A FIREARM, a deadly weapon, and did thereby cause the death of JESUS VEGA, an individual[.]

The evidence at trial showed that the deceased, Vega, eighteen years old at the time of his death, and appellant, then twenty-two years of age, were well acquainted. They attended middle school together and had mutual friends. Vega also had been involved in a relationship with appellant's sister, Eileen Gonzalez, who was the mother of his child. Witnesses testified that Vega had a short temper and was prone to verbal outbursts, and that he had a history of making threats against appellant and members of appellant's family.

On April 16, 2016, at around 1:00 p.m., appellant called a childhood friend, Ethan Bishop, and asked him to come outside. Appellant sat on the tailgate of Bishop's truck and informed him that he wanted to fight Vega. Appellant then placed a telephone call to Vega. At the time appellant placed that phone call to Vega, Vega was driving around in his car with David Palafox. Palafox testified that the tone of the phone call between appellant and Vega was aggressive. Bishop overheard appellant telling Vega that "you don't know who you're fucking with," and Bishop thought that appellant said this a couple of times. The phone call lasted less than two minutes.

Sometime after that phone call ended, Vega's car pulled up in front of Bishop's house. When Vega arrived, Bishop thought he was about to witness a fist fight between appellant and

–2–

Vega. Bishop and appellant were still sitting on the tailgate of Bishop's truck when Vega and Palafox parked the car. Bishop went inside his home "[t]o get some food," intending to "quickly come out just to see the fight."

Appellant approached the driver's side of Vega's car and touched the car. Appellant and Vega engaged in what sounded like a "normal conversation," according to Palafox. Appellant then pointed a gun at Vega's head and shot him repeatedly at point-blank range. Vega was shot a total of six times, and died at the scene. Additional shots struck and injured Palafox. As Palafox was shot, he jumped out of the passenger side of the car, laid down, and called for help. Appellant ran around the car and pointed the gun at Palafox's head, inches from his face. Palafox begged appellant not to shoot him. Appellant ran from the car toward his house. Palafox survived but sustained serious injuries and was hospitalized for over a month.

Police and emergency services personnel soon arrived. When Detective Joshua Stelter of the Grand Prairie Police Department arrived on the scene, he moved in an easterly direction from the shooting location to establish a perimeter. As he set out, the detective saw appellant come out of his home at the 300 block of West Cober Street, where he lived with his family, with his hands above his head and approach Stelter. The detective detained appellant and placed him in the back of his patrol car.

Appellant admitted to the shooting and described it in detail, demonstrating to the police how he pointed the gun at Vega. He told the police he shot Vega because he was angry with him for threatening to rape appellant's niece (who was Vega's daughter) and that the decedent threatened to have some cartel members come over and shoot him. Appellant said he did not see any guns in Vega's car prior to shooting him, and neither Vega nor Palafox had a weapon.

–3–

**DISCUSSION**

*Non-unanimous Rejection of Sudden Passion*

In his first issue, appellant contends the trial court failed to properly instruct the jury at punishment that it must unanimously reject sudden passion.

At the punishment stage of a murder trial, the defendant may raise the issue as to whether he caused the death "under the immediate influence of sudden passion arising from an adequate cause." TEX. PENAL CODE ANN. § 19.02(d) (stating that if the defendant proves the sudden-passion issue in the affirmative by a preponderance of the evidence, the offense is a second-degree felony); *Beltran v. State*, 472 S.W.3d 283, 289 (Tex. Crim. App. 2015); *Wooten v. State*, 400 S.W.3d 601, 605 (Tex. Crim. App. 2013). The jury's finding on the issue of "sudden passion" must be unanimous. *Sanchez v. State*, 23 S.W.3d 30, 33 (Tex. Crim. App. 2000). That is, the jurors must agree that the defendant either did or did not act under the immediate influence of sudden passion arising from an adequate cause. *Id.* If there is no unanimous agreement on the issue of sudden passion, the trial court must declare a mistrial. *Id.*

> The trial court's charge during punishment instructed the jury in part as follows:
>
> Now, bearing in mind the foregoing instructions, if you find by a preponderance of the evidence that the defendant caused the death of Jesus Vega while under the immediate influence of sudden passion arising from an adequate cause, you must make an affirmative finding as to the special issue.
>
> However, if you do not find by a preponderance of the evidence that the defendant committed the offense of murder under the immediate influence of sudden passion arising from an adequate cause, you must make a finding as to the special issue.

Toward the end of the charge, the court reminded the jurors that "[y]our verdict must be unanimous and shall be arrived at by due deliberation and not by majority vote or by any method of chance." The punishment charge included a "Verdict Form on Special Issue" that read: "Do you, the jury, unanimously find by a preponderance of the evidence that the defendant caused the death of Jesus

–4–

Vega under the immediate influence of sudden passion arising from an adequate cause?" The jury was told to answer either "We do" or "We do not," and was provided a space for doing so. On the next page of the charge, the verdict form included two options, one giving the jury the option of unanimously assessing a first-degree felony punishment; the other a second-degree felony punishment. *See* TEX. PENAL CODE ANN. § 19.02(d). Although the jury did not fill in the blank on the special issue verdict form, it completed the verdict form for a first-degree felony punishment, as follows:

> We, the jury, having previously found the defendant guilty beyond a reasonable doubt of the offense of Murder and having made a negative finding on the special issue, unanimously assess his punishment at confinement in the Institutional Division of the Texas Department of Criminal Justice for  30  years [Note: Here enter no less than 5 and up to 99 or life] and a fine of $  none   [Note: here enter an amount not to exceed $10,000 or write the word "none"].

The verdict form was signed by the presiding juror. By choosing the verdict form for first-degree felony punishment rather than the verdict form for second-degree felony punishment, the jury impliedly made a negative finding on the special issue on sudden passion.

Appellant argues the trial court erred because the specific provisions of the jury charge regarding sudden passion did not explicitly require a unanimous verdict on the issue. Appellant faults the trial court for including only a "general statement regarding unanimity in the body of the punishment charge." He also contends the verdict forms on sudden passion were erroneous because they did not require the jurors to indicate they unanimously rejected sudden passion.

We review jury charge error using a two-step process. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). We determine whether error exists in the charge and, if there is error, we review the record to determine whether sufficient harm was caused by the error to require reversal of the conviction. *Id.* Unobjected-to jury charge error such as this will not result in reversal of a conviction in the absence of "egregious harm." *Allen v. State*, 253 S.W.3d 260, 264 (Tex. Crim. App. 2008) (citing *Abdnor v. State*, 871 S.W.2d 726, 731–32 (Tex. Crim. App. 1994); *Almanza v.*

–5–

*State*, 686 S.W.2d 157 (Tex. Crim. App. 1985) (op. on reh'g)); *see also Olivas v. State*, 202 S.W.3d 137, 143–44 (Tex. Crim. App. 2006).

Appellant cites our opinion in *London v. State*, 325 S.W.3d 197, 207 (Tex. App.—Dallas 2008, no pet.), which in turn cited the Court of Criminal Appeals' opinion in *Sanchez*, 23 S.W.3d at 34, for the proposition that a jury's verdict on sudden passion must be unanimous, and that the trial court's failure in this case to properly instruct the jury on the unanimity requirement was error. There is no question *Sanchez* requires that a jury's verdict on sudden passion must be unanimous, but appellant's reliance on *London* and *Sanchez* is misplaced. In both cases, the charges to the jurors were identical in that they required unanimity if the jurors found in favor of the defendant on sudden passion, but did not require it to determine that sudden passion did not apply. *See Sanchez*, 23 S.W.3d at 34; *London*, 325 S.W.3d at 207. However, in the present case the charge did not suffer from a similar defect because it required the jury to render a unanimous verdict on all issues it was presented with, including sudden passion. This Court and other courts have held that it is not error for a court to wait until the end of a jury charge to inform the jury that its entire verdict must be unanimous, and that it is not necessary for the trial court to also specifically recite that the verdict on the issue of sudden passion must be unanimous. *See, e.g., Campa v. State*, No. 05–07–01210–CR, 2009 WL 1887123, *8 (Tex. App.—Dallas July 2, 2009, pet. ref'd) (mem. op., not designated for publication); *see also Barfield v. State*, 202 S.W.3d 912, 918 (Tex. App.—Texarkana, 2006, pet. ref d); *Shannon v. State*, No. 08–13–00320–CR, 2015 WL 6394922, at *14 (Tex. App.—El Paso Oct. 21, 2015, no pet.) (not designated for publication); *Latham v. State*, No. 12–05–00146–CR, 2006 WL 2065334, at *8 (Tex. App.—Tyler July 26, 2006, no pet.) (mem. op., not designated for publication). Hence, the trial court's instruction was not erroneous, and we overrule appellant's first issue.

### *Batson Challenge*

In his second issue, appellant argues the record does not support the trial court's finding that the State's peremptory strike of prospective juror Edgar Lopez, juror number 8, was racially neutral.

There is only one portion of the voir dire record where Lopez was directly questioned by either side, and it occurred when the State was explaining the elements of aggravated assault. The relevant portion of the record reads as follows:

> [STATE:] I mean, these are terms that we normally use. And that's just kind of applying it in legal context.
>
> Used or exhibited a deadly weapon—used or exhibited—now, I think we all know what used means. If I have a gun and I used it, what did I do? I shot—I shot my gun.
>
> Exhibited. Now, when I say that, what does—what occurs to you, Mr. Lopez?
>
> PROSPECTIVE JUROR: (Inaudible).
>
> [STATE]: If I go into a convenience store and I pull a gun on you and I try to rob the store, but I didn't shoot you, have I exhibited that deadly weapon?
>
> PROSPECTIVE JUROR: Yes.
>
> [STATE]: Okay. So that's what we mean. It's that you don't necessarily have to use it. But if you've taken that deadly weapon out, at that point you have committed an aggravated assault.

Later, after the defense and the State used their peremptory challenges, the defense announced it was bringing a *Batson* challenge. The defense did not specifically object to the strike used by the State to remove Lopez from the panel, but the trial court asked the State for an explanation as to why it struck him:

> THE COURT: Let me move to Juror No. 8. Juror number 8 is Edgar Lopez. Edgar Lopez is a Hispanic male. He was struck by the state.
>
> And for the record, the defendant is a Hispanic male.
>
> [STATE]: Okay. Do you want me to—

THE COURT:  What was the reason for striking number 8?

[STATE]:  Judge, with regards to Juror No. 8, he—I don't remember specifically what it was I asked him.  But in response to questions that I asked him, he seemed very confused as though he was not paying attention.

He responded to my question with a question.  And I just didn't feel like he seemed to understand what was going on or had an interest in the proceeding.

THE COURT:  Okay.  Did the defense have any notes or responses that Juror No. 8 made?

[DEFENSE]:  Yes, Your Honor.  Juror No. 8 was questioned about what it meant to exhibit a deadly weapon.  And he said show the weapon.  And [Assistant Dallas County District Attorney] Stara repeated back what he said.  And he repeated what she said.  So he was engaged in the conversation with her and knew that she was asking him about specifically exhibiting a deadly weapon.

THE COURT:  Okay.

[DEFENSE]:  And he agreed with her.

[STATE]:  Ultimately, I think that's where we got with him.  But, initially, when I asked him that question, he was, like, what, I don't know what you mean or something like that.

I can't remember specifically the words that he said.  But he just seemed sort of disengaged and then kind of like he was parroting what I said.  He didn't seem like he understood what was going on when I—that's the impression I got when I was talking to him.

The trial court ultimately announced it was overruling the *Batson* challenge, noting it did not "see any other Hispanic males who were struck by the state.  There were three other strikes that the state could have taken.  They did not."

The State argues appellant failed to preserve a challenge to the State's use of a peremptory strike against Lopez because the defense never specifically objected to the strike applied by the State regarding Lopez.  We need not resolve this question.  Even if we assume appellant properly preserved a challenge to Lopez for appeal, the record does not show the trial court's ruling was clearly erroneous.

A *Batson* challenge to the State's use of a peremptory strike generally gives rise to a three-

step analysis. *Simpson v. State*, 119 S.W.3d 262, 268 (Tex. Crim. App. 2003). First, the opponent of the strike must establish a prima facie case of racial discrimination. *Nieto v. State*, 365 S.W.3d 673, 675–76 (Tex. Crim. App. 2012). Second, if the opponent makes the requisite showing, the burden shifts to the proponent of the strike to articulate a reason for the strike that is race-neutral on its face. *Watkins v. State*, 245 S.W.3d 444, 447 (Tex. Crim. App. 2008). The ultimate plausibility of the race-neutral explanation for exercising a strike is then considered under the third step of the analysis, "in which the trial court determines whether the opponent of the strike has satisfied his burden of persuasion to establish by a preponderance of the evidence that the strike was indeed the product of purposeful discrimination." *Blackman v. State*, 414 S.W.3d 757, 765 (Tex. Crim. App. 2013). Although the burden of production shifts after the opponent makes a prima facie case, the burden of persuasion remains with the opponent of the strike to establish purposeful discrimination. *See Ford v. State*, 1 S.W.3d 691, 693 (Tex. Crim. App. 1999); *see also* TEX. CODE CRIM. PROC. ANN. art. 35.261(a). "Whether the opponent satisfies his burden of persuasion to show that the proponent's facially race-neutral explanation for his strike is pretextual, not genuine, is a question of fact for the trial court to resolve in the first instance." *Watkins*, 245 S.W.3d at 447.

The trial court's ruling on a *Batson* challenge should not be overturned unless we determine the ruling was clearly erroneous. *Blackman*, 414 S.W.3d at 765; *Nieto*, 365 S.W.3d at 676. The clearly erroneous standard is highly deferential because the trial court is in the best position to determine whether the proponent's explanation for a peremptory strike is genuinely race-neutral. *Nieto*, 365 S.W.3d at 676; *Gibson v. State*, 144 S.W.3d 530, 534 (Tex. Crim. App. 2004). The trial court must focus on the genuineness of the asserted non-racial motive, rather than its reasonableness. *Nieto*, 365 S.W.3d at 676. We defer to the trial court's ruling in the absence of exceptional circumstances. *Id.* In determining whether the trial court erred, we look to the entire

record of the voir dire and need not limit our review to the specific arguments brought forth to the trial court by the parties. *Id.* Our review of the record is conducted in the light most favorable to the trial court's ruling. *Davis v. State*, 329 S.W.3d 798, 815 (Tex. Crim. App. 2010).

In this case, counsel for the State articulated that she struck Lopez because, after asking him a question and engaging with him, she did not think he understood what was going on or had any interest in the proceedings. In an attempt to establish pretext, defense counsel argued, as appellant does now, that Lopez was engaged and ultimately did respond to the State's question. The record, however, does not show what he initially said in response to the State's question (it shows only that his response was "[i]naudible."). Later, when the parties were discussing the matter, the State argued that Lopez responded to the prosecutor's question with a question, and that he seemed "very confused," disengaged, and was just "parroting" what the prosecutor said. This led her to believe he did not understand what was going on. Additionally, the trial court pointed out when it denied the *Batson* challenge that Lopez was one of four Hispanics that were on the panel and that he was the only one struck by the State.

We conclude appellant has not shown that the stated reason provided by the State for exercising the peremptory strike of Lopez was a pretext for discrimination. Viewing the record in the light most favorable to the trial court's ruling, it does not demonstrate that the trial court clearly erred in finding the reason proffered by the State for exercising the peremptory challenge was race-neutral. We overrule appellant's second issue.

### *Sufficiency of the Evidence to Disprove Self-Defense and Defense of a Third Person*

In his third and fourth issues, appellant contends the evidence was legally insufficient to disprove self-defense and defense of a third person.

In reviewing the legal sufficiency of the evidence when a jury rejects issues such as self-defense and defense of others, we apply the well-established standard of *Jackson v. Virginia*, 443

U.S. 307, 316 (1979). *Smith v. State*, 355 S.W.3d 138, 144 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd); *see also Saxton v. State*, 804 S.W.3d 910, 914 (Tex. Crim. App. 1991). Under this standard, we view the evidence in the light most favorable to the verdict and determine whether a rational jury could have found all the elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 313; *Adames v. State*, 353 S.W.3d 854, 859 (Tex. Crim. App. 2011); *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010). The jury, as the fact-finder, may make reasonable inferences from the evidence presented at trial in determining an appellant's guilt. *Hooper v. State*, 214 S.W.3d 9, 14–15 (Tex. Crim. App. 2007). When there is conflicting evidence, we presume the fact-finder resolved those conflicts in favor of the verdict and defer to that resolution. *Jackson*, 443 U.S. at 326; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). We defer to the trier of fact's determinations of a witness's credibility and the weight to be given to their testimony. *Jackson*, 443 U.S. at 319; *Brooks*, 323 S.W.3d at 899.

A person commits the offense of murder if he (1) "intentionally or knowingly causes the death of an individual," or (2) "intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual." TEX. PENAL CODE ANN. § 19.02(b)(1)–(2).

A claim of self-defense may be raised as justification for an accused's actions. *See* TEX. PENAL CODE ANN. §§ 2.03, 9.02; *McFadden v. State*, 541 S.W.3d 277, 284 (Tex. App.—Texarkana 2018, no pet.). The penal code distinguishes between ordinary and deadly force used in self-defense. *See* TEX. PENAL CODE ANN. §§ 9.31, 9.32; *McMillan v. State*, No. 05–14–01419–CR, 2016 WL 3676169, at *5 (Tex. App.—Dallas July 1, 2016, no pet.) (mem. op., not designated for publication). As for ordinary force, section 9.31 provides that "a person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." TEX.

–11–

PENAL CODE ANN. § 9.31(a); *McMillan*, 2016 WL 3676169, at *5. "Reasonable belief" is "a belief

that would be held by an ordinary and prudent man in the same circumstances as the actor." TEX.

PENAL CODE ANN. § 1.07(42). Regarding deadly force, section 9.32 provides in part:

> A person is justified in using deadly force against another:
>
> (1) if the actor would be justified in using force against the other under Section 9.31; and
>
> (2) when and to the degree the actor reasonably believes the deadly force is immediately necessary:
>
> (A) to protect the actor against the other's use or attempted use of unlawful deadly force; or
>
> (B) to prevent the other's imminent commission of aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery.

*Id*. § 9.32(a)(1)–(2); *McMillan*, 2016 WL 3676169, at *5. "Deadly force" is "force that is intended

or known by the actor to cause, or in the manner of its use or intended use is capable of causing,

death or serious bodily injury." TEX. PENAL CODE ANN. § 9.01(3). As for defense of a third

person, the penal code provides that:

> A person is justified in using force or deadly force against another to protect a third person if:
>
> (1) under the circumstances as the actor reasonably believes them to be, the actor would be justified under Section 9.31 or 9.32 in using force or deadly force to protect himself against the unlawful force or unlawful deadly force he reasonably believes to be threatening the third person he seeks to protect; and
>
> (2) the actor reasonably believes that his intervention is immediately necessary to protect the third person.

TEX. PENAL CODE ANN. § 9.33.

Self-defense and defense of a third person require that there be a reasonable belief in the

immediate need to act. *Henley v. State*, 493 S.W.3d 77, 89 (Tex. Crim. App. 2016). As the Court

of Criminal Appeals has noted:

> Under a claim of self-defense, a person must reasonably believe that the use of force is "immediately necessary" to protect himself against the other's use or attempted

–12–

use of unlawful force. Under a claim of defense of a third person, a person must reasonably believe that his intervention is "immediately necessary" to protect the third person.

*Id.* (citations omitted) (relying, in part, on *Watson v. State*, 369 S.W.3d 865, 870 (Tex. Crim. App. 2012). Although the term "immediately necessary" is not defined in sections 9.31, 9.32, or 9.33, the Court of Criminal Appeals has observed:

> [U]nlawful conduct is justified if the actor reasonably believes the conduct is immediately necessary to avoid imminent harm. "Imminent" has been defined as "ready to take place, near at hand, impending, hanging threateningly over one's head, menacingly near." Thus, imminent harm is harm that is ready to take place— harm that is coming in the very near future. Logically, then, if conduct is "immediately necessary" to avoid harm that is imminent, that conduct is needed right now. The justification defense of necessity applies when action is needed "immediately" (i.e., now) to avoid "imminent" harm (i.e., harm that is near at hand). Applying this interpretation in the context of self-defense and defense of a third person, force that is "immediately necessary" to protect oneself or another from a person's use of unlawful force is force that is needed at that moment—"when a split second decision is required."

*Henley*, 493 S.W.3d at 89–90 (citations omitted) (relying, in part, on *Devine v. State*, 786 S.W.2d 268, 270 (Tex. Crim. App. 1989)).

A defendant has the burden of producing some evidence to support a claim of self-defense. *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003). Once the defendant produces such evidence, the State bears the final burden of persuasion to disprove the self-defense claim. *Id*. This burden of persuasion does not require the State to produce evidence refuting the self-defense claim; it requires only that the State prove its case beyond a reasonable doubt. *Id*. Self-defense is an issue of fact to be determined by the jury, and it is free to accept or reject any defensive evidence on the issue. *Saxton*, 804 S.W.2d at 914; *Butler v. State*, No. 05–17–00279–CR, 2018 WL 360237, at *5 (Tex. App.—Dallas Jan. 11, 2018, no pet.) (mem. op., not designated for publication). A jury's guilty verdict is an implicit finding rejecting a defendant's self-defense theory. *Saxton*, 804 S.W.2d at 914; *Butler*, 2018 WL 360237, at *5.

The jury in this case was instructed on the law of self-defense and defense of a third person,

–13–

and it convicted appellant of murder. In doing so, it impliedly rejected his argument that he acted in self-defense. *See Saxton*, 804 S.W.2d at 914. Appellant supports his argument regarding self-defense and defense of a third person by pointing to the following circumstances, which he argues made it reasonable for him to believe deadly force was immediately necessary:

• Vega violated two criminal trespass orders.

• Vega habitually used cocaine and marijuana.

• Vega had a short temper and was prone to verbal outbursts.

• Appellant tried to get Vega to "chill the fuck out."

• There was an altercation between Vega and appellant that occurred on a street corner outside of appellant's mother's home, and Vega displayed a large knife during this confrontation.

• Someone shot at appellant's mother's house and his grandmother's house.

• Vega physically abused appellant's sister.

• Vega told appellant he was going to get some cartel members to come over and shoot appellant.

• Vega threatened to rape appellant's niece—Vega's daughter.

• Appellant initially believed Vega was "bullshitting," but he grew concerned because Vega knew people from the cartel and appellant believed these people would give Vega weapons.

• Although appellant told the police that he was "pissed" to the point that he shot Vega, he also said that Vega's threats made him snap.

Beginning with the criminal trespass orders, cross-examination of Detective Daniel Scesney, the lead detective in the investigation, revealed that Vega was issued a criminal trespass warning in May of 2014, preventing him from being near appellant's residence. The State does not dispute that Vega was legally excluded from appellant's residence, but argues it had little or no relevance to the shooting because the trespass warning was issued two years before the shooting, and the shooting occurred in front of Bishop's house, not appellant's. Appellant claims Vega was also barred from being at the house where the shooting occurred, but the testimony is

–14–

inconsistent as to whether such a trespass warning was issued. When Bishop was asked whether it was true that his grandfather had the police issue a trespass warning for Vega to keep off his property, Bishop said, "No. It's not true." Detective Scesney was asked whether there was a criminal trespass warning against appellant regarding Bishop's house, and he said, "I believe so, yes." However, Scesney's testimony does not indicate when or why that warning was issued, much less that it was in effect at the time of the shooting.

As for Vega's habitual drug use, the testimony of the medical examiner, Dr. Varsha Podduturi, showed that Vega had traces of cocaine, marijuana, and a benzodiazepine in his system at the time of his death. But there was no testimony that appellant knew whether Vega was under the influence of drugs at the time of the shooting, nor that Vega's drug use created an immediate threat that justified shooting him.

Turning to Vega's temperament, there was testimony at trial—as we noted before—that Vega had a short temper and was prone to verbal outbursts. He could be disrespectful with others when he argued with them, and he would get into people's faces and call them names. Eileen Gonzalez testified that Vega had a "bad temper" and in certain situations his level of anger could escalate quickly. She said that she and Vega would sometimes argue, and some of these arguments included family members. Yet, the record also included evidence that Vega's threats were not credible and that he tended to "run his mouth." Gonzalez said something similar, testifying that only someone who did not know Vega—and the testimony at trial was that appellant and Vega were well acquainted with one another—would have found his threats believable.

Appellant next calls our attention to an altercation that occurred on a street corner outside of appellant's house, when Vega displayed a knife. The details of this incident are unclear, but it began when Gonzalez wanted to leave Vega and stay with her mother, Irma Urrutia. She got in a truck that belonged to her mother, but Vega still had the keys. He became "really upset." Holding

the keys to the truck in his hand, he hit the window and broke it. Irma left her house to retrieve the truck, and as she did so she could see Vega and his mother walking toward her house. When Irma asked Vega why he broke the truck window, he began screaming at her. Appellant came out of the house and intervened, asking Vega why he was treating his mother that way. At some point, Vega pulled out what Irma thought was a ten-inch knife. Gonzalez only recalled that "[i]t was a rather large knife." The police were called, and Vega ran away. Appellant declined to press charges.

Another circumstance cited by appellant was when someone shot at his mother's house and his grandmother's house. According to appellant's grandmother, Maria Urrutia, the first shooting involved her home and car; the second involved her daughter Irma's home and truck. Irma testified that they had video from surveillance cameras that showed the shots came from someone in a "little gray truck," but on cross-examination she admitted that when the police came to her home and looked at the surveillance camera footage they were unable to identify the license plate on the truck, and that they decided there was not enough information to generate a police report. Although she claimed that she recognized the truck as belonging to Vega's mother, she admitted that she never said anything about this to the police during their investigation. Detective Scesney testified that both shootings occurred in 2013, three years before the shooting in this case, and that there were no suspects; nor was there any evidence Vega was involved.

Appellant next argues that Vega physically abused Gonzalez during their relationship, and that she was afraid of him and that Vega's father was afraid of him as well. According to the record, however, Gonzalez never testified that Vega physically abused her. Asked if Vega ever physically abused her, she said, "No, he did not." Nor did she testify that she was afraid of Vega. Indeed, her mother testified that Gonzalez attended the funeral of Vega's father. And Gonzalez told the jury that Vega's father was "[n]ot afraid" of his behavior "[b]ecause he would say things

–16–

when he felt the need to say things."

Appellant further claims that Vega threatened to get some cartel members to come over and shoot him, and that Vega threatened to rape his own daughter, who was appellant's niece. According to the record, in the second of his two videotaped interviews with Detective Scesney (both of which were admitted into evidence), appellant said that when he and Vega spoke on the telephone before Vega arrived at Bishop's house, appellant asked Vega to "chill the fuck out." During his first interview (conducted on April 16, 2016, the day of the shooting), appellant said that when Vega first started talking about the cartel after arriving at Bishop's house, appellant thought he was just "bullshitting." But when Vega started talking with appellant at the car window, Vega's threats grew more serious. Vega got on his telephone with someone, and he told the person on the other end of the line to bring his guns and to "bring everything," and that they were going to "light . . . up" appellant's house. Vega also said that he was going to get the cartel and they would bring AR-15s, "choppers," and that they were going to "light . . . up" appellant. Vega continued, threatening that he and appellant were going to go to war, that Vega had already called his people, and that they would come through for him. He added that he did not care what happened and that he would rape appellant's niece. Vega also told the person on the other end of his phone conversation that he should "drop me off a gun right now," that he should "bring the gun," and that he was about to kill appellant "right now."

Appellant said he was "cool" and that he thought "it was a bunch of bullshit," but he added that although he knew Vega was not a member of the cartel, Vega's "people" had guns, Vega knew people from the cartel, and appellant thought that Vega's "people" would give him guns "to shoot my house up." When Vega indicated the cartel was coming to "bring the gun," appellant claimed he "snapped" and fired seven times at Vega. Appellant said that Vega's alleged threat to rape his niece also caused him snap because it made appellant "sick from the head," and it "triggered"

appellant. Appellant told the detective that Palafox had nothing to do with his dispute with Vega, and that he did not intend to shoot him.

Detective Scesney testified that appellant told him Vega had threatened to have members of the cartel shoot him, and that Vega threatened to rape his own daughter. But there is no evidence Vega was ever connected to the cartel, and appellant also told the detective that he did not believe Vega's alleged threats regarding the cartel. Testimony showed that Vega had a short temper and was prone to verbal outbursts, but that people who knew him understood that his threats were not credible. The jury heard Gonzalez testify that she was not physically abused by Vega; and there is no evidence Vega had physically or sexually abused his daughter. In fact, Palafox testified that Vega loved his daughter and that his top priority was to take care of her as much as he could.

The common thread running through all of these arguments is that they do not show appellant's conduct was immediately necessary, or two, that he was faced with a threat of imminent harm. *See* TEX. PENAL CODE ANN. § 9.32(a), 9.33. Appellant contends he was entitled to a presumption that his use of deadly force was immediately necessary because he knew or had reason to believe Vega was attempting to commit murder or sexual assault, he did not provoke the person against whom the force was used, and he was not otherwise engaged in criminal activity. However, the use of force against another is not justified in response to verbal provocations alone. *See id*. § 9.31(b)(1); *Walters v. State*, 247 S.W.3d 204, 213 (Tex. Crim. App. 2007); *Daniel v. State*, Nos. 04–16–00576–CR, 04–16–00577–CR, 04–16–00578–CR, 2018 WL 2694665, at *6 (Tex. App.— San Antonio June 6, 2018, no pet.) (mem. op., not designated for publication). There is no evidence Vega was armed. And the jury was free to reject appellant's self-serving assertions regarding the imminent nature of any threat posed by Vega. Also, the record shows appellant told Bishop on the day in question that he wanted to fight Vega; he initiated the contact with Vega by calling him on the phone; and then intensified their dispute by telling him more than once that

–18–

"you don't know who you're fucking with."  Furthermore, the temporal remoteness of other events on which appellant relies—e.g., the trespass orders, the knife incident, the house shootings—demonstrates no imminent threat to appellant or anyone else at the time of Vega's death, and they fail to establish any credible claim of anyone facing actual or threatened deadly force.  Based on the record in this case, we conclude a rational jury could have found beyond a reasonable doubt against appellant on the issues of self-defense and defense of a third person.  We overrule appellant's third and fourth issues.

### Legal and Factual Sufficiency of Sudden Passion Denial

In his fifth and sixth issues, appellant argues the jury's rejection of sudden passion is not supported by legally or factually sufficient evidence.

"Sudden passion" is "passion directly caused by and arising out of provocation by the individual killed . . . which passion arises at the time of the offense and is not solely the result of former provocation."  TEX. PENAL CODE ANN. § 19.02(a)(2).  "Adequate cause" is a "cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection."  *Id*. § 19.02(a)(1).

"'Sudden passion' requires first that the record contain objective evidence that direct provocation by the victim or someone acting with the victim occurred at the time of the killing." *Naasz v. State*, 974 S.W.2d 418, 423–24 (Tex. App.—Dallas 1998, pet. ref d) (citing *Merchant v. State*, 810 S.W.2d 305, 310 (Tex. App.—Dallas 1991, pet. ref'd)).  Evidence of "prior provocation" alone is not enough; the provocation must be of such a nature that it elicits more than merely "ordinary anger."  *Id*.  "The record must also contain evidence from which the jury could subjectively decide the accused killed the victim while in an excited and agitated state of mind arising out of the direct provocation."  *Id*. at 424.  "Neither ordinary anger nor fear alone raises an issue on sudden passion arising from adequate cause."  *Moncivais v. State*, 425 S.W.3d 403, 407

–19–

(Tex. App.—Houston [1st Dist.] 2011, pet. ref'd). Mere yelling and pushing will also generally not constitute adequate cause sufficient to raise an issue of sudden passion. *See McKinney v. State*, 179 S.W.3d 565, 570 (Tex. Crim. App. 2005); *Shannon*, 2015 WL 6394922, at \*13.

A defendant has the burden of production and persuasion with respect to his claim that he caused the victim's death under the immediate influence of sudden passion. *Wooten*, 400 S.W.3d at 605. When a defendant establishes by a preponderance of the evidence that he caused a victim's death under the influence of sudden passion, the offense level is reduced from a first-degree to a second-degree felony. TEX. PENAL CODE ANN. § 19.02(d); *Trevino v. State*, 100 S.W.3d 232, 237 (Tex. Crim. App. 2003).

The Court of Criminal Appeals has held that the *Jackson v. Virginia* standard is the standard reviewing courts should apply to determine the sufficiency of evidence in support of the elements of a criminal offense that the State must prove beyond a reasonable doubt. *Brooks*, 323 S.W.3d at 895. But the *Jackson* standard does not apply to elements of an affirmative defense that the defendant must prove by a preponderance of the evidence. *Matlock v. State*, 392 S.W.3d 662, 667 (Tex. Crim. App. 2013). "Although the issue of sudden passion is a punishment issue, it is analogous to an affirmative defense because the defendant has the burden of proof by a preponderance of the evidence." *Gaona v. State*, 498 S.W.3d 706, 710 (Tex. App.—Dallas 2016, pet. ref'd). Thus, the *Jackson* standard does not apply to review the sufficiency of the evidence supporting the fact-finder's rejection of sudden passion during punishment. *Smith v. State*, 355 S.W.3d 138, 147–48 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd)); *see* TEX. PENAL CODE ANN. § 19.02(d). For this reason, we conduct both a legal and factual sufficiency review in addressing this issue. *Gaona*, 498 S.W.3d at 710; *Bradshaw v. State*, 244 S.W.3d 490, 502 (Tex. App.—Texarkana 2007**,** no pet.); *see also Matlock*, 392 S.W.3d at 667.

When reviewing a legal sufficiency challenge to a negative finding on sudden passion, the

standard of review is the same as the legal sufficiency standard used in civil cases. *Gaona*, 498 S.W.3d at 710–11; *Smith*, 355 S.W.3d at 147–48. We first review the record for a scintilla of evidence to support the jury's negative finding on sudden passion and disregard all evidence to the contrary unless a reasonable fact finder could not. *Gaona*, 498 S.W.3d at 711; *Smith*, 355 S.W.3d at 147–48. If we find no evidence that supports the jury's finding, we determine whether the contrary proposition was established as a matter of law. *Gaona*, 498 S.W.3d at 711; *Smith*, 355 S.W.3d at 148. We defer to the fact finder's determination of the credibility of the testimony and weight to give the evidence. *Gaona*, 498 S.W.3d at 711; *Smith*, 355 S.W.3d at 148.

In addressing a factual sufficiency challenge to the jury's negative finding of sudden passion, we consider all the evidence in a neutral light, bearing in mind that the jury assesses the weight of the evidence and the credibility of the witnesses' testimony. *See Butcher v. State*, 454 S.W.3d 13, 20 (Tex. Crim. App. 2015); *Matlock v. State*, 392 S.W.3d 662, 671 (Tex. Crim. App. 2013). We will sustain a defendant's factual sufficiency claim only if the verdict is so against the great weight of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased. *Butcher*, 454 S.W.3d at 20; *Matlock*, 392 S.W.3d at 671; *Jamison v. State*, No. 05–16–00086–CR, 2016 WL 1725489, at *6 (Tex. App.—Dallas April 27, 2016, pet. ref'd) (mem. op., not designated for publication).

Examining the record, the evidence shows appellant told Bishop that he wanted to fight Vega, after which appellant placed a phone call to Vega. The tone of their conversation was aggressive, according to Palafox, who was with Vega that day. Bishop overheard appellant telling Vega that "you don't know who you're fucking with," and testified that he heard appellant say this a couple of times. The entire telephone call lasted less than two minutes. How much time passed between the end of that conversation and the moment when Vega's car pulled up in front of Bishop's house is unclear, but there was sufficient time for Bishop and appellant to watch Vega

–21–

drive by them a couple of times. After Vega's car pulled up in front of Bishop's house, appellant approached the car, and he and Vega carried on what seemed like a "normal conversation." Appellant then shot Vega repeatedly at point-blank range.

There was testimony that Vega had a short temper and was prone to verbal outbursts, but that people who knew him did not take his threats seriously. The jury also heard testimony that appellant did not believe Vega's alleged threats regarding the cartel. Gonzalez testified that she was not physically abused by Vega; and there was no evidence Vega had physically or sexually abused his daughter (appellant's niece).

Given the evidence in this case, the jury could have concluded that Vega's conduct was not of such a nature that it would have produced the requisite degree of "anger, rage, resentment or terror" in a reasonable person. The jury could have reasonably concluded the threats on which appellant relied were not credible, and the jury could have disbelieved appellant's assertions that he "snapped," or was otherwise "triggered." Instead, the jury could have believed Vega's conduct would have, at most, produced an "ordinary level" of anger or fear in a reasonable person under these circumstances. Although the jury could have concluded appellant was in some state of fear, "a mere claim of fear" by a defendant does not, standing alone, establish the existence of sudden passion arising from an adequate cause. *See Gonzales v. State*, 717 S.W.2d 355, 357 (Tex. Crim. App. 1986); *Shannon*, 2015 WL 6394922, at *13; *see also Latham*, 2006 WL 2065334, at *7 ("Appellant told one of the investigating officers that he had acted in a rage. He testified that he was scared and terrified. This does not establish 'sudden passion' as a matter of law.").

Because some evidence exists to support the jury's negative finding on sudden passion, the record satisfies the first part of the legal sufficiency standard and we need not consider the second part of the analysis. *See Gaona*, 498 S.W.3d at 711; *Moncivais*, 425 S.W.3d at 408. The evidence, in other words, is legally sufficient to support the jury's negative finding on sudden passion. We

–22–

likewise conclude that, after reviewing all of the evidence in a neutral light, the jury's rejection of appellant's claim that he acted out of sudden passion is not so against the great weight and preponderance of the evidence as to be manifestly unjust. Consequently, the evidence is factually sufficient to support the jury's negative finding on sudden passion. We overrule appellant's fifth and sixth issues.

### *Omission of Prior Relationship Instruction and Denial of Supplemental Instruction*

Appellant's seventh, eighth, ninth, and tenth issues concern the jury charge during the guilt-innocence phase of the trial. In his seventh and eighth issues, appellant contends the trial court erred in failing to reply to the jury's "third note" with an instruction for it to consider the prior relationship between appellant and the deceased in determining whether appellant acted in self-defense and defense of another. In his ninth and tenth issues, he argues the trial court erred in failing to authorize the jury, in the court's charge, to consider the prior relationship between appellant and the deceased for the purpose of determining self-defense and defense of another.

The record shows that the jury submitted a note during its deliberations on guilt-innocence stating they were requesting, if possible, the chronological order "of events of dates" from the first/second drive-by, the knife incident, and when Eileen moved out. The note also asked for the "911 call list from Cobert [sic]," and added, "Does not have to be exact a year would suffice." Before a response was provided, the court received a second note from the jury stating that it was "in dispute of the Chronological events of the first and second drive by dates[,] the knife incident[,] and when Ielene [sic] moved out. (The year would be acceptable if no exact dates)[.]" The note further stated that "[w]e the Jury would also like to have the 911 call list from Cobert [sic]." The trial court proposed responding with excerpts from the testimony of Detective Scesney and Irma Urrutia. The defense objected, arguing the court's response was inadequate because the jury's second note indicated they were in dispute over a fact issue, not just someone's specific testimony.

Before the court could submit its proposed response, it received a third note from the jury stating that they were "in dispute of whether or not the immediate past actions of Jesus Vega (i.e., the knife incident, [Ei]leen incidents, house shootings) towards Manuel Fino's family can be taken into consideration as a permanent trauma which could contribute to the presence of immediate fear." Upon receiving the third note, the trial court proposed responding that the jury had all of the law and evidence they will receive on that question, and to continue their deliberations. Defense counsel objected, arguing the trial court should instruct the jury that the past actions of Vega towards appellant's family could be considered in their deliberations. The trial court expressed concern that providing such an instruction would be a comment on the evidence as to "what parts are most important for them to consider when they're deliberating." The court explained it "would rather err on the side of not commenting on the evidence, if there was any question, and just allow themselves to deliberate, short of them being specific about specific transcripts that they're requesting of an issue or [a] person's comments or testimony that they're in dispute of." The trial court ultimately overruled the defense's objections.

Supplemental jury instructions like the one appellant claims should have been given here are governed by article 36.16 of the Texas Code of Criminal Procedure, which provides in part:

> After the judge shall have received the objections to his main charge, together with any special charges offered, he may make such changes in his main charge as he may deem proper, and the defendant or his counsel shall have the opportunity to present their objections thereto and in the same manner as is provided in Article 36.15, and thereupon the judge shall read his charge to the jury as finally written, together with any special charges given, and no further exception or objection shall be required of the defendant in order to preserve any objections or exceptions theretofore made. After the argument begins no further charge shall be given to the jury unless required by the improper argument of counsel or the request of the jury, or unless the judge shall, in his discretion, permit the introduction of other testimony, and in the event of such further charge, the defendant or his counsel shall have the right to present objections in the same manner as is prescribed in Article 36.15.

TEX. CODE CRIM. PROC. ANN. art. 36.16. A trial court may submit a supplemental jury charge if

the prerequisites for article 36.16 are met. *See Garza v. State*, 55 S.W.3d 74, 77 (Tex. App.—Corpus Christi 2001, pet. ref'd); *see also Daniell v. State*, 848 S.W.2d 145, 147 (Tex. Crim. App. 1993) (noting that under article 36.16, additional charge may be given after arguments at the request of the jury). A trial court may withdraw and correct a jury charge after deliberations have begun if it is convinced the given charge was erroneous. *Kirk v. State*, 421 S.W.3d 772, 785–86 (Tex. App.—Fort Worth 2014, pet. ref'd).

The trial court had the discretion to determine whether to submit a supplemental instruction under article 36.16. *Kirk*, 421 S.W.3d at 785–86; *Garza*, 55 S.W.3d at 77. Furthermore, defense counsel argued in closing that the jury could and should consider the prior relationship between appellant and Vega when deliberating the issues—a factor the trial court took into account when deciding how to respond to the jury's third note. Therefore, the trial court did not err in exercising its discretion by denying a non-mandatory supplemental instruction it believed would constitute a judicial comment on the evidence.

As for considering the prior relationship between the deceased and the accused, article 38.36(a) states:

> In all prosecutions for murder, the state or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense.

TEX. CODE CRIM. PROC. ANN. art 38.36(a). Courts have held that the rule in article 38.36 and its predecessors is a rule of evidence and that the trial court is not required to give such an instruction to the jury. *See, e.g., Milner v. State*, 262 S.W.3d 807, 809 (Tex. App.—Houston [1st Dist.] 2008, no pet.); *Huizar v. State*, 720 S.W.2d 651, 654 (Tex. App.—San Antonio 1986, pet. ref'd); *Gold v. State*, 691 S.W.2d 760, 764 (Tex. App.—El Paso 1985), *aff'd*, 736 S.W.2d 685 (Tex. Crim. App. 1987); *see also Roberson v. State*, 144 S.W.3d 34, 42 (Tex. App.—Fort Worth 2004, pet. ref'd)

(giving an instruction on article 38.36 is not mandatory); *Waites v. State*, No. 07–05–0061–CR, 2006 WL 3375233, at *7 (Tex. App.—Amarillo Nov. 21, 2006, no pet.) (mem. op., not designated for publication) ("Article 38.36(a) is essentially a rule of evidence."). Although it is permissible for the trial court to give such an instruction, it is not mandatory. *Milner*, 262 S.W.3d at 809; *Roberson*, 144 S.W.3d at 42.

Defense counsel did not object during the charge conference to the lack of any prior relationship instruction in the charge. As a result, we must first determine whether the charge as submitted to the jury was erroneous and, if so, determine whether appellant suffered egregious harm. *Allen*, 253 S.W.3d at 264; *Olivas*, 202 S.W.3d at 143–44; *Ngo*, 175 S.W.3d at 743. We find no such error. It is not reversible error to refuse to give an article 38.36 instruction. *See, e.g.*, *Milner*, 262 S.W.3d at 809. Appellant has failed to show trial court error in not including a prior relationship instruction in the charge prior to deliberations, much less that appellant was egregiously harmed by the alleged error. Thus, the court did not err in failing to include an article 38.36 instruction in the charge. We overrule appellant's seventh, eighth, ninth, and tenth issues.

### The Amended Motion for New Trial

In his eleventh issue, appellant contends /the trial court erred in not giving him a hearing on his amended motion for new trial, with juror testimony to develop his claims of juror misconduct, and that we should abate and remand this case for such a hearing.

A trial court's ruling denying a motion for new trial is reviewed for an abuse discretion. *Holden v. State*, 201 S.W.3d 761, 763 (Tex. Crim. App. 2006). In conducting a review of a trial court's ruling, we may not substitute our judgment for that of the trial court and we review the record to determine whether the trial court's decision was arbitrary or unreasonable. *Id.* A trial court abuses its discretion in denying a motion for a new trial "only when no reasonable view of the record could support the trial court's ruling." *Id.*

–26–

The right to a hearing on a motion for new trial is not absolute. *Reyes v. State*, 849 S.W.2d 812, 815 (Tex. Crim. App. 1993). A defendant is entitled to a hearing on a motion for new trial when he has raised grounds that are not determinable from the factual record. *Smith v. State*, 286 S.W.3d 333, 338–39 (Tex. Crim. App. 2009); *Reyes*, 849 S.W.2d at 815–16. For a defendant to show he could reasonably be entitled to relief on matters that are not determinable from the record, he must support the motion with an affidavit setting out the factual basis for his claim. *Smith*, 286 S.W.3d at 339. "Implicit within this rule is the requirement that the purported evidence contained in the affidavit be competent and admissible," for if it is not, "it can hardly illustrate the truth of what is being said." *Bjorgaard v. State*, 220 S.W.3d 555, 558 (Tex. App.—Amarillo 2007, pet. dism'd). In addition, a trial court's refusal to conduct a hearing will not be deemed an abuse of discretion if the affidavit or affidavits underlying the motion are conclusory in nature. *See Jordan v. State*, 883 S.W.2d 664, 665 (Tex. Crim. App. 1994).

Appellant's sentence was handed down on February 10, 2017, and he filed a motion for new trial that day without any supporting affidavits. On that same day, the trial court signed an order granting the motion. Ten days later, on February 20th, the trial court signed an order nunc pro tunc stating that the box on the February 10th order for "granted" was inadvertently checked, and that the court did not intend to grant the motion for new trial. The court further found that no ruling had been made on the motion for new trial and that the motion was still pending.

Appellant filed an amended motion on March 13, 2017, and in that amended motion he attached two affidavits to support his request for a hearing: one from the prior defense counsel and an affidavit from one of the jurors. The trial court acknowledged it had been presented with the amended motion and denied it without a hearing on March 20, 2017.[1]

---

[1] On February 27, 2017, we sent a letter to appellant's counsel pointing out the trial court's February 10th order granting the motion for new trial, and expressing concern whether we had jurisdiction over the appeal. As counsel stated in his March 6, 2017 letter to the Court, the trial court's order nunc pro tunc corrected its earlier ruling, which it attributed to clerical error, and appellant timely filed his notice of appeal on February 10, 2017. Also, the trial court completed its certification of the defendant's right to appeal. Therefore, we have jurisdiction over the appeal.

Four of the six grounds in appellant's amended motion for new trial concerned allegations of juror misconduct. Those grounds provided (in part) as follows:

1. Defendant's constitutional rights were violated when a juror(s) conducted legal research on a smart phone during the jury's deliberations on guilt or innocence. The juror(s) obtained information from the Internet as a substitute for a supplemental instruction on self-defense, which this Court declined to give.

2. Defendant's Sixth Amendment right not to be convicted except on a unanimous verdict was violated when at least one juror changed his or her vote based on the belief that guilt or innocence should be decided by majority vote.

3. Defendant's Sixth Amendment right not to be subject to specific punishment except upon a unanimous verdict was violated by the jury's quotient verdict.

4. A jury's discussion of parole requires a new punishment trial under the circumstances in Defendant's case without considering whether there was a constitutional deprivation.[2]

The affidavit from defense counsel stated, in part, that she and her co-counsel became concerned during a post-verdict conference with the jurors, based on comments made by certain jurors, that an outside influence had improperly affected the jury's determination that appellant did not act in self-defense. According to counsel's affidavit, a juror stated that a "juror(s)" had "looked up" an answer to one of the questions from the notes the jury sent to the court. Defense counsel alleged that the juror specifically indicated that, while awaiting a response from the court, the "juror(s) looked up information raised in" the jury's third note to the court, and that when the juror "referenced looking up information regarding the significance of past actions of the victim towards the victim's family, he was gesturing with his hands as if he was holding a cell phone." Defense counsel "understood this to mean that the jurors 'looked up' information from the Internet using a smart phone."

In the following paragraph of her affidavit, defense counsel added that during their "post-verdict discussion with the jurors," her co-counsel told the jurors "they could after all have properly

---

[2] The other two grounds in the amended motion for new trial addressed jury issues already raised by appellant in this appeal and a claim of insufficiency of the evidence that is not raised.

considered immediate past actions of Jesus Vega against [appellant's] family as permanent trauma that could contribute to [appellant] having immediate fear of Jesus Vega." Counsel alleged that the juror "replied, to paraphrase, that 'we were trying to find answer,' and then he gestured with his hands as if juror or jurors were looking on a smart phone for an answer." Counsel concluded "[t]he jury thus researched an outside source that was applicable to whether the 'immediate past actions' of the murder victim, [ ] Vega, towards [appellant's] family could be taken into consideration as a type of trauma that could contribute to the defendant having immediate fear of [ ] Vega at the time of the alleged murder."

Defense counsel's affidavit further alleged that "[a]n issue regarding the jurors deciding the punishment by lot was also raised during the post-verdict discussion with the jurors." According to the affidavit, one of two jurors, both of whom are identified by their first and last names in the affidavit, "asked if the defense attorneys and/or others present wanted to know how the jury determined punishment." Counsel added that she believed "this was volunteered because the jury sent a note regarding consecutive sentencing and then rendered unusual punishment verdicts, requiring lengthy incarceration in the murder case but community supervision in the aggravated assault case." Counsel also alleged the foreperson told her "jurors had been 'dividing up numbers to determine how to get to a punishment,' and that "I saw a sheet with numbers in two columns; specifically, there was a list of 4 to 5 numbers. I was in shock, and did not ask further questions."

The affidavit provided by the juror, Edward Garza, went into considerable detail regarding the jury's deliberative process, stating that he attempted to convince other jurors, specifically a group of nine, that the facts in the case showed a "classic case" of a defendant acting in self-defense. Three of the jurors, including Garza, took the position that there could be a case for self-defense based on the history of prior actions of Vega towards appellant and his family. The block

of nine jurors believed there was no case for self-defense.

The juror's affidavit also provided details regarding the alleged use of a smart phone during the jury's deliberations. Garza stated that during their deliberations another juror who was part of the group of nine jurors "did some research on what I believe was a smart phone," and that he "looked up the definition for 'immediate' to support the 9-member group's interpretation of the jury instructions." Garza provided the juror's first name and says "I believe that it was [ ] who did this, and that he used his phone to do this, but it could have been another juror's phone." Garza also said that "I believe that the research would have been on the Internet, but it could have been otherwise." Garza alleged that this juror claimed the prior relationship could not be considered "because it was not 'immediate,' as defined by his smart phone research." Garza added that there was a juror sitting next to the juror who was allegedly using the smartphone, who Garza identified by her first and last name, who was saying the same thing. Garza said he replied that the jury instructions should be understood as allowing the history between Vega and appellant's family to be considered in deciding whether appellant acted in self-defense. Garza concluded the research "influenced the deliberations because it precluded me from changing anyone's minds having solidified the position of the 9-member group."

Rule 21.3 of the Texas Rules of Appellate Procedure provides, in part, that a trial court must grant a criminal defendant a new trial:

> (c) [W]hen the verdict has been decided by lot or in any manner other than a fair expression of the jurors' opinion;
>
> (d) When a juror has been bribed to convict or has been guilty of any other corrupt conduct;
>
> * * * *
>
> (f) When, after retiring to deliberate, the jury has received other evidence; when a juror has talked with anyone about the case; or when a juror became so intoxicated that his or her vote was probably influenced as a result;

–30–

(g) When the jury has engaged in such misconduct that the defendant did not receive a fair and impartial trial.

TEX. R. APP. P. 21.3(c), (d), (f), (g).

In proving rule 21.3 has been satisfied, a defendant is limited by Texas Rule of Evidence 606(b), which provides that during an inquiry into the validity of a verdict, a juror is precluded from testifying "about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment." TEX. R. EVID. 606(b)(1); *Brooks v. State*, Nos. 05–16–00182–CR, 05–16–00183–CR, 2017 WL 4785331, *15 (Tex. App.—Dallas Oct. 24, 2017, no pet.) (mem. op., not designated for publication). In addition, "[t]he court may not receive a juror's affidavit or evidence of a juror's statement on these matters." TEX. R. EVID. 606(b)(1). However, an exception allows a juror to testify about whether an outside influence was improperly brought to bear on any juror or to rebut a claim that the juror was not qualified to serve. *See id.* 606(b)(2)(A), (B). The latter exception is not raised in this case.

"A juror's affidavit states reasonable grounds only if the matter discussed in the affidavit would be admissible in a subsequent hearing on the motion for new trial." *Dunkins v. State*, 838 S.W.2d 898, 899 (Tex. App.—Texarkana 1992, pet. ref'd). "The purpose of the affidavit requirement is to limit the parameters of the hearing that is sought on the motion for new trial." *Id.* (citing *Brown v. State*, 804 S.W.2d 566 (Tex. App.—Houston [14th Dist.] 1991, pet ref'd)). Affidavits that describe the collective thoughts of the jurors are simply imparting their "deliberative processes," and rule 606(b) bars trial courts from considering their contents. *See Bjorgaard*, 220 S.W.3d at 558. In addition, rule 606(b) "prohibits a juror from testifying, either in person or by affidavit, about 'any matter or statement occurring during the jury's deliberations.'" *Easly v. State*, 163 S.W.3d 839, 842 (Tex. App.—Dallas 2005, no pet.) (quoting *Ford v. State*, 129 S.W.3d 541, 550 (Tex. App.—Dallas 2003, pet. ref'd)).

In this case, both defense counsel's affidavit and the juror's affidavit go into considerable detail about the jury's deliberations. The majority of the juror's affidavit not only describes the collective thoughts and the deliberations of the jury, but it sets out discussions of negotiations and conversations the jurors had during the course of their deliberations. Defense counsel's affidavit also goes into detail about the jury's deliberations and how the jury determined punishment. Both affidavits contain the indirect statements of other jurors and/or describe the jury's collective thoughts. The affidavits, in other words, impart the jury's deliberative processes, and rule 606(b) barred the trial court from considering their contents. *See Bjorgaard*, 220 S.W.3d at 558. Stripped of their inadmissible contents, there was nothing in the affidavits to support the allegations in the amended motion for new trial. *See id.* Hence, the trial court did not abuse its discretion in failing to conduct a hearing on the amended motion for new trial.

Furthermore, the juror's affidavit merely stated his *belief* that another juror used a smart phone to look up a definition of "immediate," and "that the research would have been done on the internet, but it could have been otherwise." The juror also did not say how, exactly, this affected the deliberations, apart from asserting that the research influenced deliberations "because it precluded me from changing anyone's minds having solidified the position of the 9-member group." Defense counsel's affidavit is similarly vague, conclusory, and non-specific, stating that a juror was gesturing with his hands as if he was holding a cell phone when he was explaining that another juror or jurors "looked up information raised in" the jury's third note to the court, i.e., "information regarding the significance of past actions of the victim towards the victim's family." Also, the affidavit alleges that defense counsel understood this gesture to mean the juror or jurors had researched information on the internet using a smart phone. The affidavit goes on to allege the juror told counsel, "to paraphrase, that 'we were trying to find answer," and "he gestured with his hands as if a juror or jurors were looking on a smart phone for an answer." From this counsel

concluded "[t]he jury thus researched an outside source that" applied to whether the "'immediate past actions'" of Vega towards appellant's family could be considered—an assertion that is not supported by the contents of the affidavit. Thus, even if the juror and defense counsel had testified according to their affidavits, their testimony would not have met the outside influence exception to rule 606(b). *See Easly*, 163 S.W.3d at 842; *see also Jordan*, 883 S.W.2d at 665 (trial court's refusal to conduct hearing on motion for new trial is not an abuse of discretion if affidavit or affidavits underlying motion are conclusory in nature).

Based on the facts in this case, the trial court did not abuse its discretion in denying appellant's amended motion for a new trial without a hearing. We overrule appellant's eleventh issue.

### *Appellant's Statements to the Police*

In his twelfth issue, appellant argues the trial court violated his statutory and constitutional rights in admitting—after the hearing on his pretrial motion to suppress—his allegedly involuntary statements because he invoked his right to silence and his subsequent waiver of his right to silence was manipulated by the police. As part of this issue, appellant points out that the trial court overruled his objection without entering findings of fact and conclusions of law, and he asks us to abate the appeal so the trial court can prepare the requisite findings of fact regarding the voluntariness of his statement. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22 § 6.

We review a motion to suppress under a bifurcated standard, affording almost total deference to the trial court's determination of historical facts because the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002). Whether a trial court properly applied the law to the facts is reviewed with deference only in so far as it turns on an evaluation of credibility and demeanor, and mixed questions of law and fact are reviewed de novo. *Id*. The evidence is

considered in the light most favorable to the trial court's ruling. *Carmouche v. State*, 10 S.W.3d 323, 328 (Tex. Crim. App. 2000).

"A statement of an accused may be used in evidence against him if it appears that the same was freely and voluntarily made without compulsion or persuasion, under the rules hereafter prescribed." TEX. CODE CRIM. PROC. ANN. art. 38.21. Section 3 of article 38.22 provides, in part, that no oral statement of an accused made as a result of custodial interrogation shall be admissible against an accused in a criminal proceeding unless (1) the statement was recorded and (2) prior to the statement but during the recording, the accused was warned of his rights and knowingly, intelligently, and voluntarily waived those rights. *Id*. art. 38.22 § 3; *Joseph v. State*, 309 S.W.3d 20, 23–24 (Tex. Crim. App. 2010). "The warnings provided in Section 2(a) are virtually identical to the *Miranda* warnings, with one exception—the warning that an accused 'has the right to terminate the interview at any time' as set out in Section 2(a)(5) is not required by *Miranda*." *Herrera v. State*, 241 S.W.3d 520, 526 (Tex. Crim. App. 2007) (citations omitted). The State has the burden of showing by a preponderance of the evidence that an accused knowingly, intelligently, and voluntarily waived his *Miranda* rights. *See Joseph*, 309 S.W.3d at 24. "[T]he relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id*. at 25. Additionally, "the waiver must have been made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id*. In making a determination as to waiver, "the totality of the circumstances surrounding the interrogation" must be considered. *Id*.

Detective Scesney was the only witness who testified at the hearing on appellant's motion to suppress. He told the court that the first interview was conducted inside an interview room at the Grand Prairie Police Department's jail. The videotape of appellant's first interview, recorded

April 16, 2016, shows appellant and Scesney entering the examination room together and sitting down at a table.

Detective Scesney told appellant that he wanted to make sure appellant understood his rights. He read to appellant from a form (and asked appellant to follow along as he read) the statutory warnings in article 38.22, section 2(a). He told appellant he had the right to remain silent and to not make any statement at all, and that any statement he made may be used against him at his trial. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22 § 2(a)(1). Scesney asked appellant if he understood that right, and appellant said yes. Detective Scesney then read appellant the next warning—that any statement appellant made may be used against him in court. *Id*. § 2(a)(2). Scesney asked appellant if he understood that, and appellant said, "No." The detective explained to appellant that anything he told him "about what we're talking about" may be used in a courtroom "later on down the road." Appellant asked if he would have the right to defend himself. The detective quickly responded that appellant "absolutely" had a right to defend himself, before asking, "Do you understand?" Appellant said he did. The detective then read to appellant the next warning, telling him he had the right to have a lawyer present to advise him during and prior to any questioning. *Id*. § 2(a)(3). He asked appellant if he understood that, and appellant said, "Yes, sir."

Appellant said he did not have a lawyer, and he asked if he would get one. Scesney said appellant would get a lawyer if he could not afford one, and he would get to that later, but that he wanted to review the rights one by one, and not jump ahead. Appellant nodded his head and said, "Yes, sir." The detective then read the next warning, telling appellant that if he was unable to employ a lawyer, he had the right to have one appointed to advise him prior to and during any questioning. *Id*. § 2(a)(4). Scesney asked appellant if he understood this, and appellant said he did. Detective Scesney asked appellant if he could read aloud the final warning, i.e., he had the

–35–

right to terminate the interview at any time. *Id*. § 2(a)(5). After appellant read it aloud, slowly, mispronouncing the word "terminate," the detective repeated the warning. Scesney told appellant: "In other words, if you don't want to talk to me, you just tell me. I'm not gonna take it personal [sic], okay? It's no disrespect to me. You're in charge. You have the right to stop talking to me any time you want." Scesney asked appellant if he understood that, and then quickly added, "Yes or no, please." Appellant said, "Yes, sir." The detective asked again, "Do you understand that?" Appellant said, "Yeah, I understand."

Scesney told appellant that if he understood the rights that had just been read to him, he should put his initials next to each of the warnings. Appellant did this, after which the detective read to appellant from the admonishment on the form that (among other things) he was knowingly, intelligently, and voluntarily waiving the "above-explained" rights and that he was making the statement of his own free will. He explained to appellant that he did not have to talk to him, and that if he wanted to waive his rights and talk to the detective he should sign his name at the bottom of the form. But appellant was hesitant to do this, eventually telling the detective, "I'm okay, man." Scesney asked what that meant, to which appellant replied, "I'm alright, I don't need to talk to you." Scesney concluded the interview and they left the interview room.

In the hallway outside, according to the detective's testimony, he and appellant discussed some "procedural type things," such as "walk this way" and "that sort of thing," and appellant stated that he wanted to talk to his girlfriend. The detective said appellant "seemed very distracted" during this interaction, after which appellant told him "that he wanted to speak to me after all." The entire exchange lasted no more than a minute or a minute and a-half, according to Scesney's testimony.

The video recording of the first interview shows that when they were back in the interview room, the detective told appellant that he had just said he wanted to talk to him after previously

saying he did not want to talk, and that Scesney wanted "to make sure you do." Scesney added, "All right, Yes?" Appellant replied, "Yes, sir." The detective reread each of the statutory warnings to appellant, and after each warning he asked if appellant he understood the warning—to which appellant said, following each warning, "Yes, sir." The detective told appellant, "With those rights in mind, do you want to speak to me now and answer questions?" Appellant said, "Yes, sir." Scesney interviewed appellant for about fifteen minutes.

Four days later, on April 20, 2016, Detective Scesney interviewed appellant again. Prior to interviewing appellant, the detective read each of the statutory warnings to appellant and asked him if he understood the warnings that had just been read to him—to which appellant said, after each warning, "Yes, sir." The detective told appellant, "If you don't want to speak to me you just let me know, okay?" Scesney asked appellant if he understood the rights that had just been read to him, and appellant said, "Yes, sir." He then read to appellant the admonishment language on the form, after which he told appellant to sign and initial the form in the places indicated if he wanted to waive his rights and answer questions. Appellant did this, and Scesney interviewed him for about sixteen minutes.

Defense counsel objected to the admission of the recording of his first interview because appellant invoked his right to counsel; he was allegedly misled about his right to counsel; and because he did not understand any of the *Miranda* warnings "in great detail." On appeal, appellant argues the trial court erred in admitting the recorded statements because appellant unequivocally invoked his right to silence, and because the circumstances demonstrate that he could not have made an informed decision to waive his rights. Appellant further argues the detective's interaction with appellant was generally manipulative and coercive. The State responds that appellant did not preserve error because the argument on appeal does not comport with the objection raised at trial. We need not resolve this question.

Assuming appellant's argument was preserved, the trial court could have found appellant knowingly and voluntarily waived his *Miranda* rights. The videotapes of both interviews show that appellant appeared to understand his rights when they were read to him; that he answered affirmatively when asked if he understood them; that he again answered affirmatively when those rights were reread to him; and that there is no evidence of intimidation, coercion, or deception. *See Joseph*, 309 S.W.3d at 25. Therefore, appellant's statements were voluntary and the trial court did not err in overruling appellant's objection.[3] We overrule appellant's twelfth issue.

We affirm the trial court's judgment.

/Lana Myers/
LANA MYERS
JUSTICE

Do Not Publish
TEX. R. APP. 47.2(b)
170169F.U05

---

[3] Section six of article 38.22 provides, in part, that if a statement of an accused is found to have been voluntarily made and held admissible as a matter of law and fact by the court in a hearing in the absence of the jury, "the court must enter an order stating its conclusion as to whether or not the statement was voluntarily made, along with the specific finding of facts upon which the conclusion was based, which order shall be filed among the papers of the cause." TEX. CODE CRIM. PROC. ANN. art. 38.22 § 6; *see also Urias v. Stale*, 155 S.W.3d 141, 142 (Tex. Crim. App. 2004). The record shows that at the conclusion of the hearing on appellant's motion to suppress, the trial court overruled appellant's objection and ordered both interviews admitted without entering the required order. However, the only dispute was the admissibility of the two interviews, State's exhibits one and two, and that involved the interpretation of statements and actions of appellant that are conclusively shown by the video recordings. Indeed, the trial court reminded defense counsel, toward the end of her cross-examination of Detective Scesney, that counsel was "raising good points," but the court had already seen the videos and it was "really trying to get to [the] argument of counsel because I am taking in the totality of the circumstances." Therefore, we conclude a more specific finding by the trial court is not necessary in this instance. *See Richards v. State*, No. 12–13–00320–CR, 2015 WL 3609111, at *5 n. 2 (Tex. App.—Tyler June 10, 2015, no pet.) (mem. op., not designated for publication); *Amos v. State*, No. 05–12–00908–CR, 2013 WL 3554305, at *10 n. 2 (Tex. App.—Dallas July 11, 2013, no pet.) (mem op., not designated for publication); *see also Hernandez v. State*, 387 S.W.3d 881, 888 (Tex. App.—San Antonio 2012, no pet.); *Miller v. State*, 666 S.W.2d 269, 274 (Tex. App—Dallas 1984, pet. ref'd); *Zervos v. State*, 15 S.W.3d 146, 154 (Tex. App.—Texarkana 2000, pet. ref'd).



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

MANUEL FINO, Appellant

No. 05-17-00169-CR      V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court No. 7, Dallas County, Texas
Trial Court Cause No. F16-30419-Y.
Opinion delivered by Justice Myers.
Justices Lang and Stoddart participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 13th day of August, 2018.